## COMMISSIONER OF INTERNAL REVENUE v. TEXTILE MILLS SECURITIES CORPORATION.

### No. 7056.

Circuit Court of Appeals, Third Circuit.

Dec. 7, 1940.

MARIS and GOODRICH, Circuit Judges, dissenting in part.

———◇———

Louise Foster, Sp. Asst. to the Atty. Gen. (James W. Morris, Asst. Atty. Gen., and Sewall Key, Sp. Asst. to the Atty. Gen., on the brief), for petitioner.

Edmund S. Kochersperger, of Washington, D. C., for respondent.

Before BIGGS, MARIS, CLARK, JONES, and GOODRICH, Circuit Judges.

BIGGS, Circuit Judge.

### Facts.

Textile Mills Securities Corporation, the respondent taxpayer, is a Delaware corporation. Its charter is not in evidence, but it is stipulated that the taxpayer's business activities included trading in securities, investing in properties and acting as an agent for foreign and domestic principals. It also appears that all of the taxpayer's officers had connections either by way of official position or stock ownership in one or more textile manufacturing corporations. These officers were in touch with German textile corporations whose properties had been seized by the Alien Property Custodian during the first World War under the provisions of the Trading with the Enemy Act, 50 U.S.C.A. Appendix. In 1924 the taxpayer was employed by these German interests to represent them in the United States with the object of presenting their cause to Congress, and the ultimate recovery by the claimants, under anticipated legislative enactments, of their properties or compensation therefor. The properties had an estimated aggregate value of $60,000,000. Under the terms of the contracts under which the taxpayer was employed, in the event of success, the taxpayer was to receive as compensation ten per centum of the amount or value of the properties recovered. The expenses and costs incident to the undertaking were to be borne by the taxpayer. The obligations created by these contracts of retainer were to cease at the close of the Second Session of the Sixty-Ninth Congress unless the legislation sought had been enacted prior to adjournment.

The taxpayer worked vigorously to procure the desired legislation. It employed various persons and organizations, including the Ivy Lee organization, Warren F. Martin, J. Reuben Clark and F. W. Mondell. The Lee organization took charge of publicity, made arrangements for speeches and kept in touch with the press to the end that there might be editorial comment and news items. We think that it may be assumed with fairness that these news stories and editorials were to be favorable to the proposed legislation. Mr. Martin, who had been a former Special Assistant to the Attorney General, and Mr. Clark, who had been a former solicitor in the State Department, prepared brochures entitled, respectively, "Status of Ex-Enemy Property, Interpretation of Treaties and Constitution" and "American Policy Relative to Alien Enemy Property". The last is a comprehensive study of the history of the treatment of persons and property in war. Mr. Mondell, who is an attorney and a former member of Congress, was employed by the taxpayer to make proposals and suggestions to members of Congress to promote the speedy passage of the desired legislation. Mr. Mondell also appeared as counsel in hearings before the Alien Property Custodian and certain tribunals on behalf of the taxpayer's clients.

A bill for the settlement of war claims was introduced into and passed by the House of Representatives during the Second Session of the Sixty-Ninth Congress, but did not pass the Senate prior to adjournment. Before the beginning of the First Session of the Seventieth Congress, the taxpayer negotiated new contracts with its clients substantially similar in terms to those which had terminated except for the fact that these new contracts provided for the payment of 3% of the amount

or value of property recovered by the claimant and for an additional 2% of the money or property paid over by the United States within one year after the enactment of favorable legislation. In short, the contingent compensation was reduced from 10% of the recovery to a maximum of 5% of the recovery. The new contracts provided that the taxpayer should pay the costs and expenses incurred by it in the performance of its obligations under the contracts. Messrs. Lee, Martin, Clark and Mondell continued their efforts on behalf of the taxpayer. The Seventieth Congress passed the "Settlement of War Claims Act of 1928", 45 Stat. 254, 50 U.S.C.A. Appendix, §§ 9, 10, 20 et seq. At this time the services of all the persons named except Mr. Mondell terminated. Mr. Mondell continued to render services during the remainder of the year 1928 and thereafter. His services may be characterized as purely legal and consisted of appearances and arguments before the Alien Property Custodian and certain tribunals.

The taxpayer paid to the four men named various sums for their services and reported a net loss for the year 1929 of $101,405.56 and a net loss of $134,797.93 for the year 1930. We are concerned only with the year 1931 for the taxpayer pursuant to statutory authority carried forward to that year its net loss for 1929 and 1930, resulting in a net loss for 1931 of $7,615.15. The Commissioner refused to accept the losses claimed, disallowing as deductions the sums paid or credited by the taxpayer to Messrs. Lee, Mondell, Martin and Clark for the services performed by them. The Commissioner now concedes that the amounts credited to Mr. Mondell in 1929 were for services rendered "in connection with particular claims of petitioner's principal, after the enactment of the 'Settlement of War Claims Act of 1928'", in other words was compensation for legal services, not for procuring legislation, and therefore were properly deductible. The taxpayer claimed that the sums paid or credited to Messrs. Lee, Martin and Clark were deductible as ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business as provided by Section 23(a) of the Revenue Act of 1928, c. 852, 45 Stat. 791, 26 U.S.C.A. Int.Rev.Acts, page 356, and were not prohibited by Article 262 of Treasury Regulations 74 as promulgated under that act. The Commissioner contended to the contrary. The Board held in favor of the taxpayer[1] and the petition at bar followed.

### The Law.

It should be observed that a contract for allegedly procuring the very legislation here involved was twice passed upon by the Court of Appeals for the District of Columbia in two cases, viz., Gesellschaft Fur Drahtlose Telegraphie M. B. H. v. Brown, 64 App.D.C. 357, 78 F.2d 410, and Brown v. Gesellschaft Fur Drahtlose Telegraphie M. B. H., 70 App.D.C. 94, 104 F. 2d 227, certiorari denied 307 U.S. 640, 59 S.Ct. 1038, 83 L.Ed. 1521, the court having before it a suit brought by an attorney to collect a contingent fee for services rendered by him in part in promoting the remedial legislation. In the first case cited the court held the contract to be void as against public policy, stating, page 412 of 78 F.2d, that there is " * * * a general condemnation of contracts for the procuring of legislation, especially where the legislation is remedial and provides for the assertion of claims against the government, and the contract is for a contingent portion of a claim that may be given legal status through success in securing the legislation. Such contracts are illegal as tending to corrupt by improper influence the integrity of our political institutions. It is incumbent, therefore, upon the courts to pronounce void any such contract in which the ultimate or probable tendency would be to corrupt or mislead the judgments of legislators in the performance of their duties", citing Marshall v. B. & O. R. Co., 16 How. 314, 14 L.Ed. 953. While the decision in Marshall v. Baltimore & Ohio Railroad Company was based in part upon the concealment of the lobby and the lobbyist, the general principles there enunciated are applicable to the case at bar for in our opinion those principles have not been modified by the decision in Steele v. Drummond, 275 U.S. 199, 48 S.Ct. 53, 72 L.Ed. 238. In the case last cited the Supreme Court pointed out that Drummond was not employed by Steele or the railroad company to secure the passage of the desired ordinance, but was himself interested in that very end as an owner of property.

The contracts between the taxpayer and its clients were to procure "favor legislation" as distinguished from "debt legislation". See the cases cited, page 229 of 78 F.2d, note 7 to Brown v. Gesellschaft Fur Drahtlose Telegraphie M. B. H., supra. Compensation for procuring the legislation was upon a contingent basis. In the light of both of these considerations, the contracts were null and void. The services performed by the taxpayer and its agents were rendered without suggestion of corruption and, with the exception hereinafter referred to, were not unethical, but as was stated in Hazelton v. Sheckells, 202 U.S. 71, 79, 26 S.Ct. 567, 568, 50 L.Ed. 939, 6 Ann. Cas. 217, "The objection to them rests in their tendency, not in what was done in the particular case." Such contracts as were here made possess a tendency unduly to influence legislative action and to destroy the integrity of legislative institutions. The function of Congress in passing the War Claims Act was purely legislative. It was enacting a remedial statute and providing a method for the adjudication of claims thus created before another tribunal. A distinction is properly made between contracts for contingent compensation for the prosecution of a debt or contract claim even though such a debt or claim may require legislation and appropriation, and "favor legislation" which creates a debt or claim. The second is prohibited; the first is permissible provided the interest is disclosed and the methods employed are legitimate.

As found by the Board of Tax Appeals, the Lee organization was employed to handle matters of publicity, "including the making of arrangements for speeches, contacting the press, in respect of editorial comments, and news items." Obviously these news items and editorial comments did not appear under the stated sponsorship of the taxpayer or its clients. The reader of such news comments and editorials including members of Congress could not have known that they emanated from a source inspired by self-interest. Such practices tend to poison public opinion and should be condemned. See Marshall v. B. & O. R. Co., supra; Providence Tool Company v. Norris, 2 Wall. 45, 17 L.Ed. 868; 6 Williston on Contracts, p. 4879; 17 C.J.Contracts § 213. The services rendered by the Lee organization were in and of themselves not otherwise than contrary to public policy.

The taxpayer expended the sums paid to the three individuals named, and now sought to be deducted, in the execution of a void contract. In our opinion such expenditures cannot be deemed to be ordinary. They are outside the norm of ordinary business conduct. A proper construction of Section 23(a) requires its words to be given their "popular or received import". See Deputy v. DuPont, 308 U.S. 488, 493, 60 S.Ct. 363, 366, 84 L.Ed. 416, and Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212. Moreover, even if this were not so, the payment of moneys for carrying out a purpose contrary to public policy is by no means ordinary. The great weight of authority supports this view. See Burroughs Bldg. Material Co. v. Commissioner, 2 Cir., 47 F.2d 178; Chicago, R. I. & P. Ry. Co. v. Commissioner, 7 Cir., 47 F.2d 990, certiorari denied, 284 U.S. 618, 52 S.Ct. 7, 76 L.Ed. 527; Great Northern Ry. Co. v. Commissioner, 8 Cir., 40 F.2d 372, certiorari denied, 282 U.S. 855, 51 S.Ct. 31, 75 L.Ed. 757, and United States v. Sullivan, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037, 51 A.L.R. 1020.

Quite apart from the foregoing, however, we cannot perceive how the taxpayer's lobbying expenses under the circumstances of the case at bar can be deemed to be necessary expenses in the light of the principles enunciated by the Supreme Court in its decision in Kornhauser v. United States, 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505, and Deputy v. DuPont, supra, 308 U.S. page 494, 60 S.Ct. 363, 84 L.Ed. 416, for there is nothing contained in the stipulation of facts nor any finding by the Board that the services performed by the taxpayer or its agents were the moving or a contributing cause of the passage of the War Claims Act. We cannot perceive how proximate causation can be established between the efforts of lobbyists and the passage of desired legislation except where the efforts extend to actual corruption of individual members of a legislative body for, if the methods employed by the lobbyist be those of permissible persuasion, the legislative body still exercises its freedom of mind and independence of action. As that is the situation ordinarily to be presumed in the absence of a showing to the contrary, there is then interposed between the lobbyist and the law which he desires enacted an independent legislature. The business of the legislature remains the passage of legislation for the public good. It follows that

the payments here sought to be deducted could not proximately have served the taxpayer's business and were, therefore, unnecessary as a matter of law. In a far truer sense they resulted proximately from the business of the United States.[2] Where the law thus determines the want of necessity for expenditures in the operation of a business, it is neither appropriate nor allowable for the Board of Tax Appeals or the courts to find otherwise in fact because of asserted special purposes or needs of the particular business.

The conclusion, that money spent for lobbying purposes is not deductible as an ordinary and necessary business expense within the intent of the Revenue Acts, is further confirmed by the implication to be derived from recurrent Treasury Regulations denying to corporations the right to deduct such expenditures as donations for business purposes. Thus, Article 262 of Regulations 74, promulgated under Sec. 23(n) of the presently applicable Revenue Act (1928), provides in part, that "Sums of money expended for lobbying purposes, the promotion or defeat of legislation, the exploitation of propaganda, including advertising other than trade advertising, and contributions for campaign expenses, are not deductible from gross income". A similar provision was contained in T. D. 2137, 17 Treasury Decisions, Internal Revenue (1915) (pp. 48, 57–58), later appearing as Article 562 of Regulations 45, promulgated under the Revenue Act of 1918. The same provision has appeared without change in regulations promulgated under the Revenue Acts of 1921, 1924, 1926, 1928, 1932, 1934, 1936 and 1938. See Article 562 of Regulations 62, 65 and 69, Article 262 of Regulations 74 and 77, Article 23 (o)-2 of Regulations 86 and Article 23 (q)-1 of Regulations 94 and 101. It may be argued that Article 262 of Regulations 74 is in excess of the Treasury's power to promulgate interpretive regulations for the more efficient administration of the Revenue Acts, in that, this particular regulation, which purports to interpret a statutory provision having to do with charitable contributions made by individuals, applies to corporations. Nevertheless, the regulation conforms in purpose with the congressional intent as restricted by the allowance of deduction for business expenses to such as are ordinary and necessary in law as well as in fact. This may not only be reasonably inferred from the legislative history of the repeated enactments of the particular statutory provision without congressional disapproval or rejection of the regulation but that such was and is the congressional intent has more lately been impliedly confirmed by express statutory enactment.

By Sec. 23(q) of the Revenue Act of 1936, c. 690, 49 Stat. 1648, 26 U.S.C.A. Int.Rev.Acts, pages 830, 831, Congress for the first time permitted corporations to deduct, within prescribed limits, donations for charitable uses if "no substantial part of the activities of [the donee] is carrying on propaganda, or otherwise attempting, to influence legislation" etc.[3] If money paid to lobbyists were an ordinary and necessary business expense to a corporation, within the intent and understanding of Congress, then the denial by Sec. 23(q) of the right to deduct a contribution when used by the donee for such inhibited purpose could serve no effective end, for, as a business expense, the expenditure would none the less be deductible under Sec. 23(a) of the Act of 1936, 26 U.S.C.A. Int.Rev.Acts, p. 827. Furthermore, the allowance of deduction for business expenses under Sec. 23 (a) of the Act of 1936 is specified in the very same words used in Sec. 23(a) of the Act of 1928. Consequently, moneys spent for lobbying not being ordinary and necessary business expenses under Sec. 23(a) of the Revenue Act of 1936, as Sec. 23(q) clearly implies, such expenditures are likewise not ordinary and necessary business expenses under Sec. 23(a) of the Act of 1928. In expressly denying by Sec. 23(q) of the Act of 1936 any right to a corporate taxpayer to deduct contributions for lobbying, it was the evident intent of Congress to make sure by positive legislative direction that the privilege there granted to corporations of making deductible contributions for charitable uses should not be laid hold

---

[2] In this connection it should be noted that Section 12 of the Trading with the Enemy Act, 50 U.S.C.A. Appendix § 12, provides in part that "After the end of the war any claim of any enemy or an ally of enemy to any money or other property received and held by the alien property custodian or deposited in the United States Treasury, shall be settled as Congress shall direct * * *".

[3] Repeated verbatim in Sec. 23(q) of the Revenue Act of 1938, c. 289, 52 Stat. 447, 460, 464, 26 U.S.C.A. Int.Rev.Acts, page 1016.

of by a taxpayer to gain a credit against tax liability for expenditures which were not, and never had been, deductible as business expense.

For the reasons stated, we conclude that the sums paid by the taxpayer to the three individuals referred to are not ordinary and necessary expenses paid or incurred in carrying on any trade or 'business. Accordingly, the Commissioner was right in disallowing the credits claimed for the sums so expended.

The Right of the Court to Sit En Banc.

This case was originally heard by three circuit judges but before its decision this court, by special order, directed that it be reheard by the court en banc, consisting of the five circuit judges of the circuit in active service. The case has now been heard and considered by the court en banc. The order for rehearing was entered pursuant to Rules 4 and 5 of this court, effective March 1, 1940, which are set out in a footnote.[4] The authority of a circuit court of appeals thus to provide for sittings to be held by all the circuit judges has been questioned in the Ninth Circuit.[5] We therefore, deem it important to consider this question. We begin its consideration with a brief reference to the history of the federal judicial system.

The Judiciary Act of September 24, 1789, 1 Stat. 73, set up three categories of federal courts, the Supreme Court, the circuit courts and the district courts, and these courts continued to exist as thus set up (except as to the circuit courts for the period from February 13, 1801, to July 1, 1802) until the effective date of the Judicial Code, January 1, 1912, 28 U.S.C.A. § 1 et seq., when the circuit courts went out of existence. The original scheme was for the Supreme Court to be held by justices appointed to it, the district courts to be held by district judges appointed to them, and the circuit courts to be held by supreme court justices and district judges sitting together. In 1802 provision was made for the definite assignment of the Supreme Court justices to the several judicial circuits. When thus assigned and

---

[4] Rule 4 (Constitution of the Court. Quorum) is as follows:

"1. *The Court—Judges Who Constitute It—Number of Judges to Sit.* The court consists of the circuit justice, when in attendance, and of the circuit judges of the circuit who are in active service. District judges and retired circuit judges of the circuit sit in the court when specially designated or assigned as provided by law. Three judges shall sit in the court to hear all matters, except those which the court by special order directs to be heard by the court en banc.

"2. *Quorum—Adjournment of Court in Absence of—By Whom Adjourned.* Two judges shall constitute a quorum. If a quorum does not attend on any day appointed for holding a session of the court, any judge, who does attend may adjourn the court from time to time, or, in the absence of any judge, the clerk may adjourn the court from day to day.

"3. *Quorum—Interlocutory Orders in Absence of.* Any judge attending when less than a quorum is present may make all necessary interlocutory orders relating to any matter pending in the court preparatory to the hearing or decision thereof."

Rule 5 (Assignment of Judges) is as follows:

"1. *By Whom Assigned—Disqualification of Assigned Judge—Designation of Substitute.* The three judges who are to sit in the court at each daily session shall be designated by the senior circuit judge from time to time with the concurrence of a majority of the circuit judges who are in active service. If a judge so designated is unable to attend or is disqualified to sit in a particular matter the senior circuit judge shall designate an active circuit judge to sit in his stead, or, if no active circuit judge is qualified and able to sit, a retired circuit judge or a district judge of the circuit.

"2. *Cases to Be Heard by Judges So Assigned.* All matters pending in the court, except further proceedings in appeals and petitions previously heard on the merits and matters directed to be heard by the court en banc, shall be heard and decided by the judges who have thus been assigned to sit in the court at the time of hearing, if practicable.

"3. *Exceptions.* Further proceedings in appeals and petitions previously heard on the merits, except petitions for rehearing, shall be heard and determined by the judges who heard the original appeal or petition, if practicable, and may be heard at any time when the court is not otherwise in session. Petitions for rehearing shall be disposed of in the manner provided by Rule 35. If a rehearing is granted the reargument shall be heard by the judges who heard the original argument, if practicable, unless it is directed to be heard by the court en banc."

[5] Lang's Estate v. Commissioner, 97 F. 2d 867.

holding circuit court they became known as circuit justices. See Sec. 605, Rev.St. 28 U.S.C.A. § 217. The law was that the circuit justice of the circuit and the district judge of the district in which a circuit court was held might hold the court together or either of them might hold it separately.

The burden upon the Supreme Court justices at circuit became too heavy and by the Act of April 10, 1869, c. 22, § 2, 16 Stat. 44, it was enacted "That for each of the nine existing judicial circuits there shall be appointed a circuit judge, who shall reside in his circuit, and shall possess the same power and jurisdiction therein as the justice of the Supreme Court allotted to the circuit." This provision was carried into Sec. 607 of the Revised Statutes. The circuit judges thus appointed soon became primarily responsible for holding the circuit courts, largely relieving the circuit justices of this work.

The business of the circuit courts continued to increase, particularly in the Second Circuit, and by the Act of March 3, 1887, c. 347, 24 Stat. 492, the President was directed to appoint for the Second Circuit "another circuit judge, who shall have the same qualifications and shall have the same power and jurisdiction therein that the present circuit judge, has under existing laws." By the Act of March 3, 1891, c. 517, § 1, 26 Stat, 826, the President was directed to appoint "in each circuit an additional circuit judge, who° shall have the same qualifications, and shall have the same power and jurisdiction therein that the circuit judges of the United States, within their respective circuits, now have under existing laws." Thus after the passage of this act, which, as we shall see, also created the circuit courts of appeals, there were in each circuit two circuit judges, except in the Second in which there were three.

In the light of this background we turn to the provision of Sections 2 and 3 of the Act of March 3, 1891, c. 517, 26 Stat. 826, 827, 28 U.S.C.A. §§ 212, 216, which created the circuit court of appeals. These sections were as follows:

"Sec. 2. That there is hereby created in each circuit a circuit court of appeals, which shall consist of three judges, of whom two shall constitute a quorum, and which shall be a court of record with appellate jurisdiction, as is hereafter limited and established. * * *

"Sec. 3. That the Chief-Justice and the associate justices of the Supreme Court assigned to each circuit, and the circuit judges within each circuit, and the several district judges within each circuit, shall be competent to sit as judges of the circuit court of appeals within their respective circuits in the manner hereinafter provided. In case the Chief-Justice or an associate justice of the Supreme Court should attend at any session of the circuit court of appeals he shall preside, and the circuit judges in attendance upon the court in the absence of the Chief-Justice or associate justice of the Supreme Court shall preside in the order of the seniority of their respective commissions.

"In case the full court at any time shall not be made up by the attendance of the Chief-Justice or an associate justice of the Supreme Court and circuit judges, one or more district judges within the circuit shall be competent to sit in the court according to such order or provision among the district judges as either by general or particular assignment shall be designated by the court: Provided, That no justice or judge before whom a cause or question may have been tried or heard in a district court, or existing circuit court, shall sit on the trial or hearing of such cause or question in the circuit court of appeals. * * * *"

It will be seen that no provision was made for the appointment of a new group of judges to serve as judges of the circuit court of appeals which the act created. On the contrary it is clear that the court was intended to be held by three judges drawn from the three existing groups of judges who were by section 3 made "competent to sit as judges of the circuit court of appeals within their respective circuits," namely, the circuit justice of the circuit, the circuit judges of the circuit, and the several district judges within the circuit. By the later provisions of the section it is likewise apparent that the circuit justice and the circuit judges were the groups from which the judges of the new court were primarily to come, since it was only if three judges from these groups could not attend that district judges were to be called on. We stress the significant feature of the arrangement, which was that the court was to be staffed by judges who were not permanently appointed to it, but who were to be drawn from time to time

from existing groups of judges having primary responsibility for holding other courts, namely, the circuit justices for the Supreme Court, the circuit judges for the circuit courts and the district judges for the district courts.

This situation continued until the passage of the Judicial Code of March 3, 1911, c. 231, 36 Stat. 1087. By Section 117 of the Code, 36 Stat. 1131, 28 U.S.C.A. § 212, the provisions of Section 2 of the Act of 1891, supra, were codified without material change, as follows: "Sec. 117. There shall be in each circuit a circuit court of appeals, which shall consist of three judges, of whom two shall constitute a quorum, and which shall be a court of record, with appellate jurisdiction, as hereinafter limited and established."

The Judicial Code abolished on its effective date, January 1, 1912, the existing circuit courts, thus depriving the circuit judges of the courts for which they had been primarily responsible since 1869. We think the Code contemplated that the circuit judges should thereafter be ex officio judges of the circuit court of appeals rather than that they should be merely competent to sit in the court—which was their previous status. Although no express provision to this effect appears in the Code as originally enacted, it seems to us to be fairly inferable from two other provisions of the Code. The first is that Sec. 120 of the Code, 36 Stat. 1132, 28 U.S.C.A. § 216, into which the provisions of Section 3 of the Act of 1891, supra, were carried eliminated the circuit judges from the classes of judges described as "competent to sit" in the court, while retaining in that category "The Chief Justice and the associate justices of the Supreme Court assigned to each circuit, and the several district judges within each circuit." The other provision supporting the inference is that although the circuit judges were no longer referred to as "competent to sit", later provisions of the same section which were also carried forward from Section 3 of the Act of 1891, supra, clearly showed that the circuit judges were intended to hold the circuit court of appeals and that the district judges should only be designated to attend if the court could not be made up by the attendance of the circuit justices and circuit judges. It must be conceded, however, that the Judicial Code did leave the relation of the circuit judges to the circuit court of appeals in some doubt.

At the time of the passage of the Judicial Code there were, as appears from Section 118 of the Code (36 Stat. 1131), four circuit judges in the Second, Seventh and Eighth Circuits. In view of the fact, as we have seen, that the Code in Section 117 carried forward the provision of Section 2 of the Act of 1891 that the circuit court of appeals should consist of three judges, an anomalous situation was created with regard, at least, to the Second, Seventh and Eighth Circuits if the Code made the circuit judges ex officio judges of the court, since in each of those circuits there were four circuit judges. Since their circuit courts had been abolished, these judges had no court at all except the circuit court of appeals, but they obviously could not all be members of a court of three. A serious question thus was presented as to whether the circuit judges had become ex officio judges of the circuit court of appeals, and as to whether the circuit court of appeals in those circuits having more than three circuit judges consisted of all the circuit judges or only three of them, and if the latter, which three.

It was evidently to answer these questions that the Act of January 13, 1912, c. 9, 37 Stat. 52, was passed. This act amended Section 118 of the Judicial Code, 28 U.S.C.A. § 213, which had gone into force twelve days previously, by adding thereto the express provision that "The circuit judges in each circuit shall be judges of the circuit court of appeals in that circuit, and it shall be the duty of each circuit judge in each circuit to sit as one of the judges of the circuit court of appeals in that circuit from time to time according to law."

When the bill which became the Act of 1912 was under consideration in the Senate, Senator Sutherland who was in charge of the bill stated in debate (47 Cong. Record 2736): "It makes no change whatever in the existing law except to make it clear that the circuit judges in the various circuits of the United States shall constitute the circuit court of appeals." The report of the Committee on the Judiciary to the House of Representatives (House Rep. 199, 62d Cong., 2d Sess.) likewise said: "This bill deals with a defect in existing law. It makes it clear that the cir-

cuit judges shall constitute the circuit court of appeals." We think this legislative history makes doubly certain what is apparent from the act, namely, that its effect was to make clear that the circuit judges, who theretofore had been primarily responsible for holding the circuit courts, should thereafter instead constitute the circuit court of appeals. The necessary effect of this provision was that in the case of each circuit having more than three circuit judges the size of the court was increased to equal the number of circuit judges authorized by law.

It may be suggested that the provision of the Act of 1912 that it should be the duty of each circuit judge to sit in the circuit court of appeals "from time to time according to law" indicated that the judges were to rotate in sitting. But the sitting is to be "according to law" and we find no provision in the statutes referring to or regulating the designation or assignment of circuit judges to sit in the court "from time to time". On the other hand, Section 126 of the Judicial Code, 36 Stat. 1132, 28 U.S. C.A. § 223, regulates the times when the circuit courts of appeals shall sit. It is doubtless to these provisions of law that the Act of 1912 refers, thus making it the duty of the circuit judges to sit in the court at the times which the law fixes for its sessions.

We think it necessarily follows from what has been said that the effect of the passage of the Act of 1912 was to amend by implication Section 117 of the Code, which provided that the court should consist of three judges, so as to provide that in the Second, Seventh and Eighth Circuits the court should consist of four judges. The further necessary effect was that thereafter as additional circuit judges were authorized the size of the circuit court of appeals of the particular circuit was thereby increased. Consequently, by the Act of June 10, 1930, c. 438, 46 Stat. 538, 28 U.S.C.A. § 213d, the Circuit Court of Appeals for the Third Circuit was increased to four judges and by the Act of June 24, 1936, c. 753, 49 Stat. 1903, 28 U.S. C.A. § 213d—1, to five. It is interesting to note that the Act of 1936 which added the fifth judge in the Third Circuit, directed the President "to appoint an additional circuit judge of the United States Circuit Court of Appeals for the Third Circuit." This act clearly contemplated an addition to the court as well as to the number of circuit judges in the circuit and confirms the construction of the statute. which we have adopted.

Other considerations confirm our conclusion that this court consists of five judges, not three. We have seen that under the amendatory Act of 1912 all five circuit judges of the circuit are judges of the circuit court of appeals. It has always been the practice of the court for all the circuit judges to join in the adoption of rules of court and in the appointment of the clerk and librarian of the court. Conceding this, it may be suggested that but three judges may sit in the court to hear and decide appeals. The act, however, is not capable of such construction. The language is "There shall be in each circuit a circuit court of appeals, which shall consist of three judges". It is not provided that the court, merely when hearing and deciding appeals, shall consist of three judges.

Furthermore, since the act is completely silent as to the manner in which the circuit judges who are to sit in particular sessions of the court are to be selected (a further persuasive indication that all are entitled to sit) if the court consists of three judges only it would appear that the first three circuit judges who ascended the bench at the opening of the term would constitute the court and as such would have power to make rules and orders of procedure limiting the activities of their fellow judges or excluding them entirely from service in the court. Obviously a construction of an ambiguous statute which would countenance such an absurd situation, improbable as it is, ought not to be entertained.

■ A court, as distinguished from the quorum of its members whom it may authorize to act in its name, cannot consist of less than the whole number of its members. The whole cannot be less than the sum of its parts. To hold otherwise is not merely to affirm a plain contradiction in terms, but is also to destroy the authority of the court as a court and to open the way to possible confusion and conflict among its personnel and in its procedure and decisions. For an apt illustration see the conflict in decisions disclosed in John Hancock Ins. Co. v. Bartels, 308 U.S. 180, 60 S.Ct. 221, 84 L.Ed. 176. It cannot be presumed that Congress intended any such result when it increased the number of circuit judges above three. What we have said makes clear why we cannot agree with Judge Denman's contrary conclusion in

Lang's Estate v. Commissioner, 9 Cir., 97 F.2d 867. We conclude that this court has power to provide, as it has done by Rule 4 (1), for sessions of the court en banc, consisting of all the circuit judges of the circuit in active service. The court which heard the reargument of the present case was accordingly lawfully constituted.

What has been said does not affect in any way the provision of Section 117 of the Judicial Code, 36 Stat. 1131, 28 U.S.C.A. § 212, that two judges of this court shall constitute a quorum. Consequently it is entirely competent for the court to provide, as it has done by Rule 4, that three judges shall sit to hear all matters unless otherwise specially ordered and that two judges shall constitute a quorum. It has been the practice for the circuit courts of appeals to sit in groups of three judges. We think the practice is an excellent one which should be followed in all but exceptional cases. Where, however, there is a difference in view among the judges upon a question of fundamental importance, and especially in a case where two of the three judges sitting in a case may have a view contrary to that of the other three judges of the court, it is advisable that the whole court have the opportunity, if it thinks it necessary, to hear and decide the question. Common sense and sound practice dictate that the five judges of this court should be in a position to decide the principles of law and practice to which the court is to be committed. We think the statute does not stand in the way and that the court has the power under existing statutes to sit en banc.

### Conclusion.

A majority of the court having concluded that the decision of the Board of Tax Appeals should be reversed, an order will be entered reversing that decision and remanding the cause with the direction to redetermine the tax in accordance with the view expressed by the majority.

I am authorized to state that Judge JONES concurs in this opinion.

CLARK, Circuit Judge (concurring).

■■ The writer of this opinion concurs in the judgment reversing the decision of the Board of Tax Appeals. He is furthermore satisfied about the right of the court to sit en banc and with the careful and clearly stated analysis of the facts. He wishes, however, to express a somewhat different legal emphasis from that of his brethren constituting, with him, the majority of the court.

The task of interpreting the obscurities of the various taxing statutes always holds one's technical attention. It does not so generally hold one's human interest as well. In the case at bar, however, both parts of the judicial nimbus are involved. The exact practices of the case at bar have received the unanimous condemnation of the courts,[1] of the legal text and periodical writers,[2] of the political scientists,[3] and finally of the intended victims, as various statutes for the regulation of lobbyists bear witness.[4] The particular victims were the

[1] Trist v. Child, 21 Wall. 441, 22 L.Ed. 623.

[2] 15 Amer. & Eng. Ency. of Law, 2d Ed., p. 969; Legislation—Control of Lobbying, 45 Harvard Law Review 1241 (note); Public Utilities: Expenditures to Influence Public Opinion, 14 Cornell Law Quarterly 233 (note); Contracts—Illegality—Lobbying, 12 Texas Law Review 85 (note); Lobbying Contracts—Contingent Fees—Public Policy, 14 Boston University Law Review 834 (note).

[3] Bryce, The American Commonwealth, Vol. 1, p. 555, Vol. 2, pp. 66, 514, 520, 653; Odegard, Political Parties and Group Pressure, 179 Annals of American Academy of Political and Social Science (Pressure Groups and Propaganda), p. 68; Bernays, Molding Public Opinion, p. 82; McKean, A State Legislature and Group Pressure, p. 124; Catlin, The Role of Propaganda in a Democracy, p. 219; Bernays, Crystallizing Public Opinion; Herring, Lobbying, 9 Ency. of the Social Sciences 565; Odegard, Pressure Politics; Herring, Lobbying in Congress; Crawford, Inside Story of Lobbying; Muller, Lobbying in Congress (The Reference Shelf, Vol. 7, No. 3).

[4] Ga.Code Ann. (Michie, 1926) Pen.Code §§ 325(1)–(5); Ind.Ann.Stat. (Burns, 1926) §§ 8108–16; Kan.Rev.Stat.Ann. (1923) c. 46, §§ 201–10; Key.Stat. (Carroll, 1930) §§ 1999a 1–8; Me.Rev.Stat. (1930) c. 2, §§ 43–48; Md.Ann.Code (Bagby, 1924) art. 40 §§ 4–14; Miss.Code Ann. (1930) § 5477–84; Mo.Rev.Stat. (1919) § 7154; Neb.Comp.Stat. (1929) §§ 50–302 to 304; N.H.Pub.Laws (1926) c. 4, §§ 28–33; N.Y.Legis.Law (1909) § 66; Ohio Gen.Code (Page 1932) §§ 6256–1 to 8; Okla.Stat.1931, § 2292 (modified); R. I.Gen.Laws (1923) c. 123, §§ 1776–73; S.D.Comp.Laws (1929) §§ 5092–5100; Wis.Stat. (1929) §§ 346.20–26.

Senators and Representatives of the United States who expressed their feelings in 1934 in other tax legislation where they denied exemption to organizations, a "substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation", 26 U.S.C.A. Int.Rev.Code, § 101(6).

The reason is plain. If argument was a matter of the critique of pure reason, it might be appraised apart from its source. As most argument depends upon disputed premises the burden of verification depends upon (is proportionate to) the impartiality of the arguer. Furthermore there exists the imponderable of sincerity. If a cause is espoused by a person you know or know of, his sincerity or insincerity is bound to affect the weight you give to his presentation. These considerations are particularly applicable in a democracy which tends increasingly away from Burke's theory of representation and toward the continental theory of a mandat imperatif. The thought the writer is attempting to express has been well phrased: "A different element is infused when the nexus between the propagandist and his principal is hidden, for tribunals have developed a policy adverse to the exertion of secret influences upon public bodies. The question of the legality of not disclosing the identity of those seeking to influence public action first arose in connection with lobbying contracts. Though without the slightest hint of fraud or dishonesty, many contracts were declared void as against public policy. Secrecy doomed the agreement. The cases demand frank dealing, where public interests are concerned. Secret efforts to touch the minds of the legislators, secrecy concerning the connection between lobbyist and client, these are the evils in the eyes of the tribunals. This same attitude towards legislative activities of agents whose principals are undisclosed is revealed by statutes in many states requiring the registration of all lobbyists". Public Utilities: Expenditures To Influence Public Opinion, 14 Cornell Law Quarterly 233–234 (note).

Although the Board saw fit to ignore the circumstance, it might be noticed that the cases generally stress contingency of compensation as a sinister element in this class of contracts, Noonan v. Gilbert, 63 App. D.C. 30, 68 F.2d 775, and cases therein cited. The logic of this last position has been criticized in 14 Boston University Law Review 834 (note), above cited, but may, the writer should think, be justified on the ground that the necessary size of a contingent fee adds to the temptation of impropriety. Whatever, then, the ultimately correct decision, it must be based on a repudiation of the Board of Tax Appeals' theory of legitimacy.

The writer proceeds, then, on the assumption that the expenses here claimed deductible have met with the condemnation of every student, judicial or otherwise, of public affairs in a democracy, who has expressed his thoughts on the matter. Does that universal condemnation constitute a mandatory gloss of the adjectives "ordinary" and "necessary"? The writer thinks it does and he says further that the contrary view expressed by some judicial personalities rather shocks him. One of the latter speaking for the majority of a divided court puts that position thus, "The revenue laws of the United States are not oversqueamish", Alexandria Gravel Co. v. Commissioner, 5 Cir., 95 F.2d 615, 616. Well, as far as the writer is concerned they are. The writer suggests to the learned Circuit Judge above quoted that the Congress will probably not thank him for his somewhat gratuitous interpretation of their legislative morals. The writer may say that the learned court seems to have had some of the very same qualms they refuse to attribute to Congress. Anyway, they weakened their own decision by naively asserting that the State Senator of Louisiana employed to sell "sand and gravel" to the Highway Commission of the "kingfish" domain did not exert any "personal influence" (he was undoubtedly employed because of his expert knowledge of geology).

The important word is, of course, ordinary. Although the cases,[5] or most of them,[6] stress the conjunctive character of the phrase they are rather compelled to emasculate necessary, and for obvious reasons. After all, very few things (and very few people) are indispensable. The high-

---

[5] Hubinger v. Comm., 2 Cir., 36 F.2d 724; Seufert Bros. Co. v. Lucas, 9 Cir., 44 F.2d 528; Lloyd v. Com'r, 7 Cir., 55 F.2d 842; Alexander Sprunt & Son, Inc. v. Com'r, 4 Cir., 64 F.2d 424; 30 Words and Phrases, Permanent Edition, pages 169–175.

[6] A. Harris & Co. v. Lucas, 5 Cir., 48 F.2d 187.

est authority[7] substitutes the milder "helpful" and certainly the practices in the case at bar were "helpful" to the respondent.

There are at least three possible methods of approach to a construction of the key adjective. They have all received judicial approval, but as they all, in the writer's judgment, lead to the same Rome of non-deductibility, it is not important here which one is adopted. As a matter of English, the word is thus defined, "customary or established order, general, customary, usual or normal, such as is commonly met with, of the usual kind, often, not above, or rather below, the average level of quality, commonplace", New Century Dictionary, p. 1197. It is clear that the writer is not in a position to determine whether the present practice is or is not a common occurrence in the American business world. The reported cases disapproving of the evil seem small in proportion to the extent of that world and the corresponding occasion for its exercise. That is, however, an unreliable guide as it does not take into account other factors which may have been producing causes. Testimony as to the reality of either the usual custom or the specific instance, although perhaps shameful, could like any other sad reality have been produced. A failure to offer the pleasanter evidence of an opposite tendency to a most ethical generosity cost the virtuous taxpayer his deduction in Welch v. Helvering, above cited.

A second interpretative test of ordinary is derived from the law of torts. The cases require the business act to be proximately caused. Alexander Sprunt & Son v. Com'r, above cited, Com'r v. Continental Screen Co., 6 Cir., 58 F.2d 625. In so doing they seem, at any rate, to be prescribing the requirement of foreseeability held essential to recovery in cases of indirect causation. That foreseeability in the writer's circumstance is, of course, the "reasonable contemplation of reasonable business men", 3 Paul & Mertens, Law of Federal Income Taxation, p. 46. This theory would seem to stem from some association of ideas. The word ordinary smacks of the average reasonable man and leads to the thought of the cognate proximate cause. It is probably as ·sensible to allow the deduction of foreseeable expenses as it is to allow recovery for foreseeable harm. It seems, nevertheless, a novel canon of statutory construction. The "reasonable contemplation of reasonable business men" like "reasonable care under the circumstances" sets up something of an imponderable standard. As juries and courts wrestle with the latter, so the courts must perhaps struggle with the former. To do so, they must be equipped with weapons in the shape of testimony and so under this test also the writer is confronted with the same failure of business proof he has already spoken of.

The third angle of incidence is to the writer's way of thinking both the most satisfactory and most in accord with sound principles of legislative interpretation. It postulates an understanding of and a desire for the effective working of the democratic process on the part of all the organisms of that process. From that follows the assumption that any word capable of an interpretation consistent with the said effective working must receive such an interpretation and no other. And from that follows the further assumption that the Congress will be held to have intended to include in the word ordinary at minimum no practices falling below the standards to which the courts have given their own approval. In other words the courts will take for granted that the Congress did not intend to use a word capable of being stretched to cover acts which both it and the courts condemn and to benefit actors which both it and the courts refuse to help. Both Congress and the courts, as the writer has pointed out, have many times expressed their unfavorable opinion of these attempts to sell the pig of public welfare in the poke of public service. Mr. Justice Cardozo in Welch v. Helvering, above cited, with his usual felicity said, "The standard set up by the statute is not a rule of law; it is rather a way of life", 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212. The writer refuses to sanction the Congressional way of life envisaged for the Congress by the Board of Tax Appeals.

So much for what the writer thinks to be principle. How much for what the petitioner claims to be the authority? Many more decisions than are cited in the briefs can be found in volume 3 of Paul & Mertens, Law of Federal Income Taxation. The learned authors thereof note the struggle that has shaken the courts in their efforts to arrive at what the writer is declaring to be the sound conclusion. " * * *

---

[7] Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212.

Underlying the whole question is the conflict between two major forces. On the one side is the desire to stultify or discourage criminal acts by denying the taxpayer even incidental benefits therefrom as, for example, the deduction for income tax purposes of the expenses incurred in connection with the criminal act. This is the 'public policy' force. The conflicting force arises from the statutory warrant to deduct ordinary and necessary expenses of the business. One cannot predict with any degree of certainty the right to such deductions. If the act necessitating the expenditure is wholly tainted with criminality, public policy prevails and the deduction is denied. On the other hand, if the act does no great violence, tested by the mores of the day, the Court may, sometimes by tortuous reasoning, emerge with a permission to deduct." 3 Paul & Mertens, Law of Federal Income Taxation, p. 44.

Nevertheless, the weight of authority, if that is important, is on the writer's side. The cases both in the Board of Tax Appeals and in the courts are collected and collated in 3 Paul & Mertens, above cited, under the headings, Fines and Penalties § 23.45, Counsel Fees § 23.46, Cost of Legislative Representation: 'Lobbying' Fees § 23.47, and under the cognate titles, Charitable Contributions § 23.66, Gambling Expenses and Exchanges in Illegal Transactions § 23.156, Statutory Provision for Losses § 26.02, Nature of Organizations Which Are Exempt § 32.14. It is perhaps interesting to note that the same general problem has arisen under a somewhat similarly framed English statute,[8] and that the cases appearing in 17 Halsbury's Laws of England, 2d Ed., p. 152 et seq., seem to be in harmony with the ethical view for which the writer is contending. See Inland Revenue Commissioners v. Warnes, & Co., 2 K.B. 444, Inland Revenue Commissioners v. Von Glehn, 2 K.B. 553. There is also one case in the Privy Council on Appeal from New Zealand wherein the expenditure denied deduction was by a brewery, for canvassing, advertising and printing directed to swaying the voters in a referendum on local option, Ward and Company Ltd. v. Conn., 1 English Law Reports, Appeal Cases, p. 145.[9]

The Board of Tax Appeals, in one sense, two judges of this court and other judges of other courts, in another sense,[10] stress the rule of administrative construction. They refer, of course, to Regulation 74, Article 262, which forbids any deduction, or at least a sort of quasi-charitable deduction, to corporations expending money "for lobbying purposes, the promotion or defeat of legislation, the exploitation of propaganda, including advertising other than trade advertising, and contributions for campaign expenses".[11] The writer of this opinion has little faith in this rule. He quite agrees with the learned author of an article in the Yale Law Journal who says:

"Among the innumerable fictions which have formed a part of the science of law, that which holds the record for unrealism is the doctrine that where a statute has been reenacted in the same form after an administrative construction, Congress has silently approved and incorporated the existing ruling. Our tax laws are reenacted so repeatedly that this rule is invoked more often that the general statement as to the validity of regulations standing alone. Unfortunately, the reenactment rule presumes an attention on the part of Congress in connection with tax legislation which is more ideal than real. The thought is that Congress, each time it passes a revenue act, has omniscience as to all outstanding regulations and judicial decisions and that it will be thoroughly diligent to correct by legislation any interpretation with which it disagrees. There follows the thought that inaction is action in that a failure to legislate implies an agreement with all outstanding regulations, without any apparent distinction as to their interpretative or legislative character.

"Anyone cognizant of the processes and exigencies of tax legislation is perfectly familiar with the simple fact that any

---

[8] 8 & 9 Geo. 5, c. 40, Cases I & II, Sched. D, r. 3(a).

[9] Taxation—Income Tax—Corporations —Deductions From Gross Income For Charitable Contributions as Ordinary Business Expense, 30 Columbia Law Review 1211 (note); Taxation—Income Tax Deduction—Commercial Bribery as an "Ordinary and Necessary" Expense, 35 Columbia Law Review 125 (note); Taxation—Income—Deductibility of Counsel Fees Paid by Corporation in Defense of Prosecution, 17 Virginia Law Review 831 (note).

[10] Vide Sunset Scavenger Co., Inc. v. Com'r, 9 Cir., 84 F.2d 453.

[11] See 3 Paul & Mertens, above cited, § 23.66.

such presumption is not only artificial, but in large part unfounded. * * *" Paul, Use and Abuse of Tax Regulations in Statutory Construction, 49 Yale Law Journal 660, 663, 664.[12]

The writer finds no lack of logic in taxing income from illegal sources,[13] and refusing a deduction for the same type of expenses. After all, the word applicable to one face of the medal, income, is the broadest possible, whereas the words applicable to the other have the many limitations the writer has tried to indicate. Further, the medal as a whole embodies policies and a probable Congressional intent which must have consistent application. Any discouragement of ill-gotten gains entails a corresponding lack of sympathy with the means of getting them. Thus everything the rascal takes in must be taxed, and as little as possible of what he expends must be exempted. In conclusion, the writer might note that the decision of the Board of Tax Appeals runs contrary to their recent holdings.[14]

MARIS, Circuit Judge (dissenting in part).

█ I fully concur in the opinion of my brethren that this court consists of all five circuit judges in active service and that the court may lawfully sit en banc, as it did in this case. I find myself, however, unable to agree with the conclusion which the majority have reached as to the merits of the case for reasons which I shall state.

The taxpayer entered upon the business of seeking to bring about the return of its principals' seized property through the passage of Congressional legislation authorizing such return. Its compensation was to be contingent upon and measured by its success in securing the return of the property and it was to bear all the expenses of its effort. Among these expenses were substantial sums paid to Ivy Lee for publicity work, including the making of arrangements for speeches and speakers around the country and cooperating with the press in editorial comments, as well as news items, and to W. F. Martin and J. Reuben Clark for preparation of propa-

ganda concerning international relations, treaty rights, and the historical policy of the United States relative to enemy-owned property in times of war. It is these sums which the taxpayer seeks to deduct from its gross income as ordinary and necessary expenses of its business in computing its net income subject to income tax. The majority of this court deny the right to the deductions upon grounds, none of which, in my opinion, is valid.

Three of my brethren conclude that the Board of Tax Appeals erred in holding the deductions to be "ordinary" business expenses and therefore within the category of deductions permitted by the Revenue Act. As I understand it, they take the view that the expenses were not "ordinary" because they were paid in execution of a contract which was void as against public policy and because they were paid in an enterprise which was against public policy and which in any event did not meet the standard of morality in public affairs set by students of political science.

Their conclusion that the contract between the taxpayer and its principals is against public policy is rested upon the decisions of the Court of Appeals of the District of Columbia in Gesellschaft Fur Drahtlose Telegraphie M. B. H. v. Brown, 64 App.D.C. 357, 78 F.2d 410, and Brown v. Gesellschaft Fur Drahtlose Telegraphie M. B. H., 70 App.D.C. 94, 104 F.2d 227, holding void the provisions of a similar contract between alien claimants and an American agent which provided for the payment of compensation to the agent on a contingent basis. Those decisions were placed upon the ground that the Settlement of War Claims Act was "favor legislation" as distinguished from "debt legislation" and that a contract to procure "favor legislation" for a contingent fee is against public policy and, therefore, void. It was accordingly held that the agent might not recover the contingent fee stipulated for in the contract. I have grave doubt of the soundness of the distinction thus drawn between "favor legislation" and "debt legislation"[1] and I am clear that in any event the

---

[12] Cf. The Supreme Court On Administrative Construction as a Guide in the Interpretation of Statutes, 40 Harvard Law Review 469 (note).

[13] United States v. Sullivan, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037, 51 A.L.R. 1020.

[14] Easton Tractor and Equipment Co.

v. Comr., 35 B.T.A. 189; Mrs. William P. Kyne v. Comr., 35 B.T.A. 202; Alexandria Gravel Co. v. Comr., 35 B.T.A. 323; T. G. Nicholson v. Com'r, 38 B.T.A. 190.

[1] The distinction sought to be drawn, as I understand it, is between legislation designed to provide for or facilitate the set-

validity of the contract has no bearing on the question before us, for reasons which will be discussed later. But even if its bearing be conceded it seems to me that the Settlement of War Claims Act was in fact "debt legislation."

Section 7 of the Trading with the Enemy Act, 50 U.S.C.A. Appendix § 7, authorized the seizure by the alien property custodian of enemy-owned property such as the textile properties here involved, but it did not purport to confiscate these properties without return or compensation. On the contrary it clearly contemplated that the former owners had claims which would have to be dealt with after the war, for by Section 12, 50 U.S.C.A. Appendix § 12, the act provided that "After the end of the war any claim of any enemy or of an ally of enemy to any money or other property received and held by the alien property custodian or deposited in the United States Treasury, shall be settled as Congress shall direct." Here was not only the recognition of the existence of claims on the part of the former owners of seized property but also a clearly implied invitation to them to solicit from Congress legislation providing for the settlement of their claims. That the Settlement of War Claims Act which finally provided for these claims was "debt legislation" seems to me quite clear in the light of these circumstances. [2]

As I have already suggested, however, I think that even though the taxpayer's contract was void because in violation of a public policy which frowns upon the offering of a contingent compensation for procuring legislation, it does not follow that the expenses paid in carrying out the agency constituted by the contract were not ordinary business expenses. The illegality suggested is as to the manner of compensation and not as to the result sought to be accomplished. It, therefore, seems to me to be wholly immaterial to the decision of the case before us whether the contract between the taxpayer and its principals was void because of the contingent fee for procuring what the majority describe as "favor legislation." The fact remains that the business contemplated by the contract was carried through, the contingent compensation was paid and is now being taxed, and the expenditures here sought to be deducted were expended in carrying on that business and earning that compensation. The alleged invalidity of the contract obviously does not affect the taxability of the income and I see no basis for holding that it affects the deductibility of the expenses.

It is said by the majority that since the expenditures in question were made in execution of a void contract they "cannot be deemed to be ordinary. They are outside the norm of ordinary business conduct." It is also said that the solicitation of legislation, commonly known as "lobbying", is against public policy and has been condemned by judges and political scientists and that "the payment of moneys for carrying out a purpose contrary to public policy is by no means ordinary." As my colleague Judge CLARK puts it in his concurring opinion the public policy, which he suggests prohibits "lobbying," must be read as a mandatory gloss upon the adjective "ordinary" in the statute. To me this is not interpretation but amendment of the legislative language. Section 23(a) of the Revenue Act of 1928 authorizes the deduction in computing net income of "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." The majority I think lose sight of the fact that the reference

---

tlement of existing claims against the government and legislation which confers benefits upon individuals who had no claims against the government prior to its passage. This distinction seems to have been first expressed by the Court of Appeals of the District of Columbia in the first Brown case, supra. I do not find the distinction referred to in any decision of the Supreme Court of the United States. On the contrary the rule of that court seems to be to strike down such contracts as against public policy if it appears to the court that they are likely to facilitate and encourage the corruption of the legislative body. Trist v. Child, 88 U.S. 441, 21 Wall. 441, 22 L.Ed. 623. If this is the test, as I think it is, it would seem to follow that "debt legislation," since it is ordinarily devoid of general public interest and, therefore, not subject to public scrutiny during the process of enactment, would provide a much greater opportunity for legislative corruption than "favor legislation" which ordinarily affects a larger section of the public and is, therefore, subject to much greater public attention while being considered by the legislative body.

[2] For cases in which contingent fee contracts have been upheld under similar circumstances see Spalding v. Mason, 161 U.S. 375, 16 S.Ct. 592, 40 L.Ed. 738; Winton v. Amos, 255 U.S. 373, 41 S.Ct. 342, 65 L.Ed. 684, and Hollister v. Ulvi, 199 Minn. 269, 271 N.W. 493.

is to any trade or business. It seems obvious to me that the act contemplates that taxpayers will engage in all sorts of trades and businesses including businesses which are against public policy or even criminal in character, and that those expenses which are ordinary and necessary in each particular type of trade or business may be deducted from the income derived therefrom. The determination of the character of the expenses as ordinary and necessary is, therefore, not to be based, as the majority suggest, upon "the norm of ordinary business conduct" in general but is to be made in the light of the relation of the expenses to the particular trade or business. As Mr. Justice Cardozo said in Welch v. Helvering, 290 U.S. 111, 113, 54 S.Ct. 8, 9, 78 L.Ed. 212, "Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance."

It seems to me that the majority by their decision are converting into a penal statute what was intended by Congress to be solely a revenue measure. The revenue laws, as Judge Sibley aptly said in Alexandria Gravel Co. v. Commissioner, 5 Cir., 95 F.2d 615, 616, "are not over-squeamish. By the broad definition of gross income, income arising from an illegal business is taxed even though the illegality be one declared by the Constitution itself. United States v. Sullivan, 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037, 51 A.L.R. 1020. The provisions of the statute fixing the deductions to be regarded in arriving at the net income which alone is taxed, 26 U.S.C.A. § 23 [26 U.S.C.A. Int.Rev.Code § 23], are as broad and unqualified as those defining the taxable gross income." There is no suggestion in these provisions that the word "ordinary" is to be restricted in meaning to those expenditures only which are not against public policy or which meet a moral standard laid down by textwriters and courts. On the contrary it has been held that business expenses are deductible even though by reason of the nature of the business they involve payments so clearly criminal as bribes for "protection." Steinberg v. United States, 2 Cir., 14 F.2d 564. As Judge Hough demonstrated in the case cited the income tax law is not a penal statute but a revenue measure. It taxes income derived from criminal enterprises as well as those which the law countenances and its purpose is to tax the net income derived therefrom not the gross receipts.

In the present case the business upon which the taxpayer entered was that of soliciting through propaganda the passage of legislation, commonly known as "lobbying." This is an activity which Congress has never seen fit to prohibit and which has always been freely indulged in without restraint. The facts stipulated in the record before us do not show that the taxpayer indulged in any questionable practices or that its activities in respect of which the expenses were incurred were against public policy. It was incumbent upon the government to show that the taxpayer's activities were illegal or against public policy if such was the case. It failed to do so. Certainly this court may not indulge the presumption, as I think the majority do, that the petitioner was guilty of improper conduct not disclosed by the record merely because it did not produce affirmative evidence of its innocence.

The question which we are called upon to determine is whether the Board of Tax Appeals was in error in finding as a fact that the activities for the cost of which the taxpayer seeks deduction were ordinary in the particular business in which it was engaged. As we have seen, the taxpayer engaged Ivy Lee to arrange publicity and Martin and Clark to prepare propaganda. I think it must be conceded that publicity and propaganda are methods of procuring legislative action which have been universally employed in this and every other democratic nation. Since the business in which the taxpayer was employed was that of soliciting legislation by Congress it seems to me to be entirely clear that expenditures for publicity and propaganda were "ordinary" in its particular line of business within the meaning of the Revenue Act. It is wholly beside the point to consider whether such expenditures would be ordinary in business generally. It is doubtless true that expenditures for lobbying activities are not ordinary in the case of persons engaged in mining, manufacturing or commercial businesses, but here lobbying was not merely incidental to the taxpayer's business but itself constituted the business. I do not understand that it is suggested that the taxpayer's expenses were not of the kind ordinarily incurred in the business of lobbying. To hold that these expenditures are not "ordinary" within the meaning of the Revenue Act because we think that they contravene that undefinable concept of the judicial mind which the courts have called

"public policy", or because they are deemed to be unwise or improper by political scientists and judges seems to me to be reading into the Revenue Act what is not there. In doing so the majority have placed the stamp of illegality upon conduct which Congress has never declared to be criminal. I think that in thus restricting the plain language of the act this court is exercising a legislative and not a judicial function. I cannot agree that we have such power.

Two of my colleagues suggest that the Board of Tax Appeals erred in finding that the expenditures in question were "necessary" business expenses because the activities which they represent cannot be shown to have been the proximate cause of the legislation enacted by Congress. Their view is, that only those expenses are necessary which result in achieving the object sought by the taxpayer for which the expenditures were incurred and that in this case the taxpayer's expenditures could not have been the proximate cause of the passage of the legislation sought since Congress must be presumed to have acted independently in the public interest. I cannot agree that the Revenue Act contemplates any such restriction upon the deductibility of business expenses. Certainly it has never heretofore been suggested that the deductibility of a business expense is contingent upon the success of the business enterprise in which it is incurred. So to hold would impose an intolerable burden upon taxpayer and Commissioner alike. Nor do I see any merit in the suggestion that the expense was not necessary because Congress must have acted independently and not as a result of the taxpayer's activities. Mercantile advertising seems to me a perfect analogy. I do not think that my colleagues would go so far as to suggest that a merchant must be disallowed his trade advertising expenses because he cannot show that those expenses brought in customers or because he cannot show that the customers who did arrive came in under the hypnotic influence of his advertising and not in the exercise of an independent judgment in the light of their own self-interest. I entirely agree with Judge CLARK that the word "necessary" as used in the act must be read as "helpful" and must be considered in the light of the enterprise in which the taxpayer is engaged rather than the result which it is seeking to achieve.

Finally two judges of the court take the ground that Article 262 of Regulations 74 prohibits the deduction of expenses of the character involved in this case. I agree with the conclusion of the Board of Tax Appeals that this article of the regulations does not prohibit the deduction of these expenditures if they may fairly be classed as ordinary and necessary business expenses. The article in question is as follows:

"Art. 262. *Donations by corporations.*— Corporations are not entitled to deduct from gross income contributions or gifts which individuals may deduct under section 23 (n). Donations made by a corporation for purposes connected with the operation of its business, however, when limited to charitable institutions, hospitals, or educational institutions conducted for the benefit of its employees or their dependents are a proper deduction as ordinary and necessary expenses. Donations which legitimately represent a consideration for a benefit flowing directly to the corporation as an incident of its business are allowable deductions from gross income. For example, a street railway corporation may donate a sum of money to an organization intending to hold a convention in the city in which it operates, with the reasonable expectation that the holding of such convention will augment its income through a greater number of people using the cars. Sums of money expended for lobbying purposes, the promotion or defeat of legislation, the exploitation of propaganda, including advertising other than trade advertising, and contributions for campaign expenses, are not deductible from gross income."

The article is arranged in the Regulations under Section 23 (n) of the Revenue Act. That section is entitled "Charitable and Other Contributions". It authorizes the deduction of such contributions in the case of an individual. By restricting deductions of this character to individuals the act denies them to corporations. I think that Article 262 was intended merely to be interpretive of Section 23 (n) by making clear what that section leaves to inference, namely, that charitable and similar donations are not deductible, as such by corporations and that lobbying and legislative expenses are likewise not deductible as such or in the guise of donations. The article was not intended to be interpretive of business expenses or to restrict the deduction of any

expenditures which may fairly be deemed ordinary and necessary expenses of business under Section 23 (a) of the act. That this is so is borne out by the fact that Article 262 does not contain a cross-reference to Article 121 which does define business expense, while the latter, which states "As to items not deductible, see Section 24 and Article 281–284," does not contain a similar cross-reference to Article 262. Furthermore, Article 262 itself points out that donations to charities may be deducted by a corporation as business expenses when made for purposes connected with the operation of its business.

The interpretation adopted by my colleagues would, it seems to me, render the article invalid as an invasion of the legislative power. Section 23(a) of the Revenue Act authorizes the deduction of business expenses provided only that they are ordinary and necessary. Nowhere in the act is there any further qualification that they must not have been incurred for lobbying or the promotion of legislation. Consequently, the effect given to Article 262 of the Regulations, by my colleagues is, not to construe, interpret or implement an ambiguous, doubtful or general provision of the act, but rather to amend the unambiguous language of Section 23 (a) by adding to it a proviso to the effect that lobbying expenses shall not be deducted by a taxpayer even though they are ordinary and necessary in its business. It is settled that the law cannot thus be amended by regulation. Koshland v. Helvering, 298 U.S. 441, 56 S. Ct. 767, 80 L.Ed. 1268, 105 A.L.R. 756; Manhattan General Equipment Co. v. Commissioner, 297 U.S. 129, 56 S.Ct. 397, 80 L. Ed. 528. In Koshland v. Helvering, supra, Mr. Justice Roberts said (298 U.S. pages 446, 447, 56 S.Ct. page 770, 80 L.Ed. 1268, 105 A.L.R. 756):

"Where the act uses ambiguous terms, or is of doubtful construction, a clarifying regulation or one indicating the method of its application to specific cases not only is permissible but is to be given great weight by the courts. And the same principle governs where the statute merely expresses a general rule and invests the Secretary of the Treasury with authority to promulgate regulations appropriate to its enforcement. But where, as in this case, the provisions of the act are unambiguous, and its directions specific, there is no power to amend it by regulation. Congress having clearly and specifically declared that in taxing income arising from capital gain the cost of the asset disposed of shall be the measure of the income, the Secretary of the Treasury is without power by regulatory amendment to add a provision that income derived from the capital asset shall be used to reduce cost."

In Sunset Scavenger Co. v. Commissioner, 84 F.2d 453, 457, the Circuit Court of Appeals for the Ninth Circuit had under consideration the effect to be given to Article 262 of the Regulations. It held that this Regulation limited the sweeping terms of the statute by entirely prohibiting the deduction of lobbying expenses. This holding was based upon its conclusion that "the statute is ambiguous because it makes no determination of what is or is not an 'ordinary and necessary' expense." But what is "ordinary" or "necessary" as a business expense is clearly a question of fact to be determined in the light of the particular business in which the taxpayer is engaged. The words do not create an ambiguity but merely call for the exercise of the fact finding function. To permit the Commissioner of Internal Revenue to limit the scope of these words must necessarily involve authorizing him "to convert what in the view of the statute is a question of fact requiring proof into a conclusive presumption which dispenses with proof and precludes dispute," to use the words of Mr. Justice Sutherland in Miller v. United States, 294 U.S. 435, 440, 55 S.Ct. 440, 442, 79 L.Ed. 977. To continue in his words: "This is beyond administrative power. The only authority conferred, or which could be conferred, by the statute is to make regulations to carry out the purposes of the act—not to amend it." I am, therefore, not persuaded by the opinion of the court in the Sunset Scavenger Co. case that Article 262 should be given the broad construction which my colleagues have placed upon it.

I am authorized to say that Judge GOODRICH concurs in this dissent.