## GESELLSCHAFT FUR DRAHTLOSE TELE-GRAPHIE M. B. H. v. BROWN.*
### No. 6294.

United States Court of Appeals for the District of Columbia.

Argued April 8, 1935.

Decided May 13, 1935.

Frank J. Hogan and G. Thomas Dunlop, both of Washington, D. C., and Geo. Whitefield Betts, Jr., of New York City, for appellant.

Stanton C. Peelle and Paul E. Lesh, both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

VAN ORSDEL, Associate Justice.

Appellee, plaintiff below, sued defendant corporation for legal services performed by paintiff and three associates in representing defendant in claims held against the United States. From a judgment for the sum of $250,000 for the services so rendered defendant prosecutes this appeal.

The court below based its judgment upon an extended and very elaborate finding of fact, and in this appeal any defense on the merits has been waived. Counsel for defendant company plant their case upon certain questions of law upon which the present appeal turns.

It appears that in February, 1917, the defendant company was a corporation organized under the laws of Germany with its principal office in Berlin. That prior to the World War it had rights, titles, and interests in the United States of a value of approximately $10,000,000, consisting of the capital stock of the Atlantic Communication Company, a New York corporation, which owned and operated a wireless station in the state of New York, together with the capital stock of the Patents Exploitation Company, another New York

*Writ of certiorari denied 56 S. Ct. 139, 80 L. Ed. —.

corporation, which owned the patents having to do with radio and radio reception. All the property belonging to defendant company was seized in part by the United States government, and the remainder by the United States Alien Property Custodian, so that at the time of the date of the contract, June 22, 1922, the defendant company held claims for the property so seized but which were not recognized as valid and enforceable either by the United States or by the Alien Property Custodian. It was this situation which led defendant company to employ plaintiff and his associates as attorneys to represent it in its claims against the United States.

Defendant corporation entered into the following contract with plaintiff and one Alfred Frankenthaler, the contract being in the form of a letter and an acceptance of the terms and conditions therein stated. The letter reads as follows:

"New York, June 22, 1922.
"Messrs. Alfred Frankenthaler and John Wilson Brown III.
"Gentlemen:
"We hereby authorize and appoint you our attorneys, and request you to take such steps as you may deem necessary or advisable for the protection or recovery of any rights, titles, or interests, direct, derivative, contingent, or otherwise, of us or any of us, arising out of or in any way connected with the acts, seizures, or demands of, or possession, sale, or transfer by the Alien Property Custodian of the United States, the United States Government, or any of its departments, bureaus, or divisions, or their respective agents or representatives, or affecting or arising out of any related matters or out of the recent World War, and to enforce such rights against any person, firm, corporation, department, bureau, division, or government, and to make compromise or settlement in respect to such rights.

"It is agreed that you shall be entitled to keep as a retainer fee on any recovery of money or property, a sum equal to 25% thereof, to be deductible from any recovery by you up to the sum of one hundred thousand dollars, ($100,000.00) in money or property at its fair valuation. If the valuation of said property cannot be agreed upon between us, same shall be submitted to arbitration.

"It is agreed that a fair and reasonable fee for all services performed resulting in recovery in excess of one hundred thousand dollars ($100,000.00), in money or property, shall be paid to you only out of such recovery. The amount of this fee shall be later determined by agreement between the parties, or failing to reach an agreement, the parties shall submit the same to arbitration.

"We reserve the right to terminate this employment at any time, provided that at the time of revocation a fair and reasonable fee for your services rendered to the date of termination shall be paid in lieu of your contingent interest in the recovery.

"Should you at any time terminate your employment, you will of course, give us ample notice.

"Yours very truly,
"Gesellschaft Fur Drahtlose Telegraphie, M. B. H.
(Expressly including our interest, direct or indirect, as creditor, owner, stockholder, or otherwise of Atlantic Communication Co., Patent Exploitation Co., etc.)
"By Willy Bredow,
"Attorney in Fact (power of attorney dated April 10, 1922)."

The two contracting attorneys associated with them George Frankenthaler, a New York attorney, and Alfred K. Nippert, a practicing attorney of Cincinnati, Ohio, with office connections in the District of Columbia. Plaintiff holds by assignment from his associates the entire claim here sued upon.

The court below in its findings of fact stated: "The contract of employment of June 22, 1922, was drafted by the plaintiff and the language was made by him sufficiently comprehensive to include within the scope of the services to be performed by him and his associate the securing of remedial legislation" (and that plaintiff so understood the contract is abundantly shown by the character of services actually performed).[1] "Such services as were performed by the plaintiff and his associates were

---

[1] Pursuant to and in furtherance of said agreement, plaintiff and his associates sought and endeavored to secure the passage by Congress of such remedial legislation, during the course of which endeavors plaintiff and his law partner, Alfred K. Nippert, appeared and made arguments before a committee of the House of Representatives. Plaintiff and his associates negotiated for and secured the coopera-

all pursuant to and comprehended within the provisions of the written contract of employment of June 22, 1922, and there was no employment of the plaintiff or any of his associates, Alfred Frankenthaler, George Frankenthaler, or Alfred K. Nippert, independently of said written agreement. * * * The written contract contemplated and included such services as might thereafter become necessary or advisable in securing remedial legislation in consideration of a contingent reward out of the interest in any recovery by the defendant resulting from such services."

It is alleged by way of defense that plaintiff had been employed by the Alien Property Custodian from January 20, 1919, to April 15, 1921, during which period the United States and the Custodian, "acting partly or wholly by and through the plaintiff and others, then in or connected with the office of the said Alien Property Custodian, partially or wholly divested the defendant of its aforesaid rights, titles, and interest, because of which said seizure and detention there arose the defendant's claims for the return thereof or compensation therefor." In other words, the suit is defended upon the ground that the "employment and letter of employment were obtained from the defendant, not on its own initiative, but by the active procurement of the plaintiff and the said Alfred Frankenthaler, and are both in fact and in law null and void as against public policy." The further defense is made that the contract by its terms might involve the procurement of legislation and necessitate plaintiff and his associates using their influence with members of Congress. This occurred, and it is contended that the contract in terms providing for contingent compensation for the services rendered, and thus containing the inducement to use undue influence in securing the legislation, it must be construed as a lobbying contract, and therefore void.

▆▆▆▆ Considering first the defense based upon the rule of law that plaintiff having been employed in the office of the Alien Property Custodian between the time the property was seized and the present contract of employment entered into, plaintiff's claim for attorneys' fees is void and unenforceable, since it is in conflict with the well-established rule of public policy that where an attorney has acted for a client he cannot thereafter assume a position hostile to the client concerning the same matter, or use against the client knowledge or information obtained from him while the relation existed. It is contended that this rule extends to officers of the government employing attorneys and that such officers are entitled to the same protection against unprofessional conduct on their part as are private persons.

The propriety of this rule has long been recognized and enforced. It is the enunciation of a principle of the common law that courts will not lend their aid to enforce illegal contracts or contracts inconsistent with sound morals or public policy. This has led to a general condemnation of contracts for the procuring of legislation, especially where the legislation is remedial and provides for the assertion of claims against the government, and the contract is for a contingent portion of a claim that may be given legal status through success in securing the legislation. Such contracts are illegal as tending to corrupt by improper influence the integrity of our political institutions. It is incumbent, therefore, upon the courts to pronounce void any such contract in which the ultimate or probable tendency would be to corrupt or mislead the judgments of legislators in the performance of their duties. Marshall v. B. & O. R. Co., 16 How. 314, 14 L. Ed. 953.

It is urged by counsel for plaintiff, and the court below seems to have adopted the theory, that there is nothing in the conduct of the plaintiff, under his contract, or in the terms of the contract itself, that are adverse to the interests represented by the Alien Property Custodian, or to the interest of the United States. The property seized was taken as a war measure and was subject either to retention by the government of the United States or to return to the proper owner upon the cessation of the war. The government through Congress early expressed its determination not to retain this property, but in due time to return it to the parties from whom it had been taken. With the determination of this policy, it is insisted, the government relinquished its claim to the property, and

---

tion of persons representing other interests seeking relief through the same proposed legislation. They also attempted to defeat and claimed credit for defeating, proposed legislation which was designed to afford partial relief to Telefunken, and to other German and American clients of theirs (finding of fact No. 28).

held it merely as a stakeholder, subject to return to the proper parties when the time and occasion would be expedient. It is contended that the services rendered for the defendant, and for which compensation is sought by plaintiff and his associates, were services purely in the interest of the defendant, and it cannot be said that any information acquired by plaintiff, during his connection with the Custodian's office, was used or could be used against either the interests of the Custodian or the government of the United States.

It is suggested that the court below was influenced by the nonappearance of either the government or the Alien Property Custodian in the defense of this case. It cannot be regarded that their nonappearance constituted such a waiver as to relieve plaintiff of the terms and conditions of the contract. In determining the question of public policy, we are not so much concerned with what was done by the plaintiff, as by what the terms of the contract afforded him and his associates an opportunity of doing. The contract in broad terms authorized plaintiff and his associates to take such steps as they might deem necessary for protecting the rights of the defendant against the Alien Property Custodian, the United States government, or any of its departments, or their agents or representatives, and to enforce their rights against any department, bureau, or division of the government.

To determine the inducement afforded the plaintiff and his associates for improper or corrupt conduct, the terms of the contract are controlling, and in determining the validity of their claim for compensation the court must be guided by what they contracted to do rather than the service rendered. As was said in Hazelton v. Sheckels, 202 U. S. 71, 78, 26 S. Ct. 567, 50 L. Ed. 939, 6 Ann. Cas. 217: "It will be noticed further that the conveyance was in substance a contingent fee. * * * The promise to convey did not become binding until the services were rendered, and, when rendered, according to the allegations of the bill, they were legitimate. We assume that they were legitimate, but the validity of the contract depends on the nature of the original offer, and, whatever their form, the tendency of such offers is the same. The objection to them rests in their tendency, not in what was done in the particular case. Therefore a court will not be governed by the technical argument that when the offer became binding, it was cut down to what was done, and was harmless. The court will not inquire what was done. If that should be improper, it probably would be hidden, and would not appear. In its inception, the offer, however intended, necessarily invited and tended to induce improper solicitations, and it intensified the inducement by the contingency of the reward."

In the case of Providence Tool Co. v. Norris, 2 Wall. 45, 54, 55, 17 L. Ed. 868, the court, considering a conditional agreement between Norris and the Tool Company by which Norris agreed to procure from the War Department a contract for the purchase of arms to be used during the Civil War, the court said: "Agreements for compensation contingent upon success, suggest the use of sinister and corrupt means for the accomplishment of the end desired. The law meets the suggestion of evil, and strikes down the contract from its inception. There is no real difference in principle between agreements to procure favors from legislative bodies, and agreements to procure favors in the shape of contracts from the heads of departments. The introduction of improper elements to control the action of both, is the direct and inevitable result of all such arrangements." This statement of the law was approved by the Supreme Court in Crocker v. United States, 240 U. S. 74, 36 S. Ct. 245, 60 L. Ed. 533. Indeed, the approval of the rule, in this class of cases, seems to be without exception. Trist v. Child, 21 Wall. 441, 22 L. Ed. 623; Meguire v. Corwine, 101 U. S. 108, 25 L. Ed. 899; Oscanyan v. Winchester Repeating Arms Co., 103 U. S. 261, 273, 26 L. Ed. 539; Sage v. Hampe, 235 U. S. 99, 105, 35 S. Ct. 94, 59 L. Ed. 147.

It must, however, not be understood that we are holding all contingent fee contracts for the enforcement of claims against the government, or even for the procuring of legislation, void as against public policy. There is a sharp distinction between contingent-fee contracts for the prosecution of claims against the government which are in the nature of debts or contract claims, and contingent contracts for procuring favors through contracts from the heads of government departments, or the procuring of general remedial legislation, authorizing a contract or granting advantages or benefits to which, prior to the enactment, the contractor has no existing legal claim. In the

latter instance such contracts are held void as against public policy. In the former the head of a department or Congress acts in a quasi-judicial capacity in adjusting an individual debt or claim. Services rendered for the claimant in petitioning and appearing before the officers of the government or committees of Congress are as professional as appearing in a court of justice.

It follows that contracts for contingent compensation for the prosecution of a debt or individual contract claims against the government, even though they may require legislation and appropriation, and the procuring of legislation granting benefits, where no other remedy existed for the enforcement of the claim against the government, have been generally upheld. The old common-law rule against champertous contracts has been generally abrogated in the federal courts of this country, and largely so in the state courts; the equitable and just reason for this advance is comprehensively stated in one sentence, in Wright v. Tebbitts, 91 U. S. 252, 253, 23 L. Ed. 320, where the court said: "To deprive a claimant of the means of obtaining such professional service would be to deprive him, in many instances, of the means of asserting and enforcing his claim."

The courts have been liberal in upholding conditional fee contracts for the presentation of individual claims before the departments of the government, or in prosecuting such claims in Congress and securing their allowance by legislation. In Stanton v. Embrey, 93 U. S. 548, 556, 23 L. Ed. 983, involving services in prosecuting a claim against the United States before the accounting officers of the Treasury Department for contingent compensation, the court, upholding the contract, said: "Coming to the merits, the first objection of the plaintiffs in error is that the contract set up in declaration is one for a contingent compensation. Such a defence, in some jurisdictions, would be a good one; but the settled rule of law in this court is the other way. Reported cases to that effect show that the proposition is one beyond legitimate controversy. Wylie v. Coxe, 15 How. 415 [14 L. Ed. 753]; Wright v. Tebbitts, 91 U. S. 252 [23 L. Ed. 320]. * * * Professional services, to prepare and advocate just claims for compensation, are as legitimate as services rendered in court in arguing a cause to convince a court or jury that the claim presented or the de-

fence set up against a claim presented by the other party ought to be allowed or rejected."

The cases make no distinction between contingent contracts for presenting claims before the departments of the government and presenting similar claims to Congress and procuring legislation to secure the allowance and payment of such claims. Taylor v. Bemiss, 110 U. S. 42, 3 S. Ct. 441, 28 L. Ed. 64; Ball v. Halsell, 161 U. S. 72, 16 S. Ct. 554, 40 L. Ed. 622; Spalding v. Mason, 161 U. S. 375, 16 S. Ct. 592, 40 L. Ed. 738; Valdes v. Larrinaga, 233 U. S. 705, 706, 34 S. Ct. 750, 58 L. Ed. 1163; McGowan v. Parish, 237 U. S. 285, 35 S. Ct. 543, 59 L. Ed. 955; Winton v. Amos, 255 U. S. 373, 41 S. Ct. 342, 65 L. Ed. 684.

We are forced to the opinion that the contract in the present case falls within the condemned class. Plaintiff contracted in express terms to take such steps as might be deemed necessary to protect the rights and interests of the defendant and to enforce such rights against the government or any of its departments, bureaus, or divisions. This provision broadly opened the door for plaintiff and his associates through the inducement of the large compensation involved to attempt means and methods which have led to the establishment by the courts of the rule of public policy, which renders this contract null and void.

Defendant had no existing legal claim against the government prior to the enactment of the War Claims Act, nor was any claim in its favor specifically granted or established by the act. It required legislation to create the rights so that claims for compensation under plaintiffs' contract could be instituted in the department or tribunal provided. In the passage of the Settlement of War Claims Act of 1928 (45 Stat. 254), Congress was acting in a purely legislative capacity and not in a quasi-judicial capacity. It was not adjudicating the right of defendant or any other claimant to recover an individual claim against the government. It was merely enacting a remedial statute, providing a method by which claims might be adjudicated in a proper tribunal and the rights of claimants be determined.

Our conclusion is reached somewhat reluctantly, since defendant's conduct is not entirely above reproach. After reaping the reward of plaintiff's efforts, through which

a claim for $5,000,000 was established, defendant elected to terminate plaintiffs' employment under the right reserved in the contract. The contract stipulated that in case of revocation "a fair and reasonable fee" should be paid for the services rendered. Common honesty would seem to dictate a compliance with this condition of the contract, and the payment by defendant of reasonable compensation for the services it received at the hands of the plaintiff and his associates. On the contrary, corporate conscience is satisfied by pleading the rule of public policy, and unfortunately the court is restrained, by virtue of this rule, from granting plaintiff any relief.

■ Nor are we impressed with the suggestion that inasmuch as defendant availed itself of the right under the contract to terminate this employment and to pay "a fair and reasonable fee" for the services rendered to the date of termination, that the action here may be upheld, since it is in the nature of a suit in quantum meruit to recover reasonable and fair compensation for the services rendered. The difficulty with this contention is that the determination of the compensation, if any, defendant is entitled to, depends upon the services rendered, and this at once leads to the terms and conditions of the contract which, if void, prohibits the recovery of any compensation under it.

The judgment is reversed, with costs, and the cause remanded for further proceedings not inconsistent with this opinion.