### GROVER v. MERRITT DEVELOPMENT CO.

#### No. 197.

District Court, D. Minnesota,
Fourth Division.

Aug. 27, 1942.

Sylvan E. Hess and Sanborn & Andre, all of St. Paul, Minn., for objecting creditors.

William H. Dunn appeared pro se (T. S. Plowman, of Washington, D. C., was on the brief).

NORDBYE, District Judge.

The War Minerals Relief Act was passed on March 2, 1919. Its principal object was "to relieve persons and companies who had been invited by the government to invest money in the production or preparation for the production of certain metals or materials for use in the war, and who had incurred expense and suffered losses because of the armistice, and the lack of market for such products." Ickes v. Cuyuna Mining & Investment Co., 63 App.D.C. 91, 69 F.2d 662, 663. Section 5 of the Act, 40 Stat. 1272, 50 U.S.C.A. § 80 note, provides in part:

"That the Secretary of the Interior be, and he hereby is, authorized to adjust, liquidate, and pay such net losses as have been suffered by any person, firm, or corporation, by reason of producing or preparing to produce, either manganese, chrome, pyrites, or tungsten in compliance with the request or demand of the Department of the Interior, the War Industries Board, the War Trade Board, the Shipping Board, or the Emergency Fleet Corporation to supply the urgent needs of the Nation in the prosecution of the war. * * *

"The said Secretary shall make such adjustments and payments in each case as he shall determine to be just and equitable; that the decision of said Secretary shall be conclusive and final * * *."

Under said Act, loss in the sum of $665,926.33 was claimed by the Merritt Development Company as the result of the mining operations carried on under government stimulation, and the Secretary of the Interior made an award of $17,-585.07 as a matter of "sympathetic consideration." The remainder of the claim was disallowed. At the time the claim was filed and the award was made, the Merritt Development Company was under receivership in this Court. In that the Secretary's finding of fact is conclusive, the determination thereof under the then existing legislation became final.

At the time the claim of the Merritt Development Company was pending before the Secretary of the Interior, the claimant Dunn herein was employed as a field auditor by the War Minerals Relief Commission. This employment continued from May, 1919, to March, 1921. He thereafter resumed his employment with the Commission beginning in March, 1922, and remained in such employment until the end of May, 1925. During a part of his employment, he was designated as chief examiner or chief accountant for the Commission. While Dunn was with the Commission, and in response to the claim filed by the former Receiver herein, he came to Minnesota in behalf of the Commission, viewed the properties of the Merritt Development Company, audited the records, and generally familiarized himself with the situation in so far as it had any bearing on the merits of the Receiver's claim. He was employed by the Commission when the award of $17,585.07 was allowed and paid to the former Receiver.

Some time during the Summer of 1927, Dunn sent out a circular letter addressed to a large number of claimants under the War Minerals Relief Act. The letter was designated "Re War Minerals Relief Legislation," and states in part:

"As it is now over two years since I left the Department of the Interior, I am permitted under the law to act for claimants. You doubtless know that as a Field Auditor for the First and as Chief Accountant for the Second Commission, practically all claims came under my notice, and that I have perhaps a closer practical knowledge of the Act and its administration than anyone else.

"Because of various rulings of Government officials it is generally conceded that the majority of claimants have not yet been fully paid the amount of their loss. It is also a fact that legislation for additional awards presented to the last Congress failed, although the representations were pressed with activity and ability by small bands of agents and claimants. There is every reason to believe that this activity will be increased before the next Congress. I have been asked to assist in this work and in the handling of certain

claims for additional award as, if, and when legislation permits.

"Would you not, therefore, favor me with your views and figures as they affect your claim that I may be the more fully armed for discussions with Senators and Congressmen? * * * I desire this information for the purpose of supporting our activity in the endeavor to obtain additional legislation * * *."

In commenting upon the legislation which failed to pass the last Congress, and as to which future activity would be centered, he mentioned, among others: "3. To Give Claimants the Rights to Appeal to the Court of Claims. (It was anticipated that Claimants should have the right of appeal from the decision of the Secretary of the Interior, for it was held that the Secretary had narrowly construed the act and intent of Congress. This section mostly affected those who had not received an award on the ground that the claim was not within the meaning of the Act)." And he concludes his letter by stating: "In addition it was proposed in the unpassed bill to limit the fee payable to attorneys to 10% of the amount recovered."

From the correspondence introduced at the hearing, it may be gathered that the president of the Merritt Development Company, one Franklin W. Merritt, in response to the circular letter sent out by Dunn, assumed to approve the suggestion of a ten per cent contingent fee because, on October 14, 1927, he wrote Dunn as follows: "In reply to yours of the 8th inst. Wish to state that your offer to take up case referred to in a former letter on contingent fee, same to be 10 per cent of any awards, is perfectly satisfactory to me."

On October 18, 1927, Dunn wrote Merritt: "I have your letter of the 14th inst., and shall immediately take up the matter of reviewing the file of your claim closely; that I may be the better able to discuss the injustices with the legislators." Then, later in the letter: "The second bill, if passed, will allow a test before the Court of Claims. We can put up a good showing to the effect that the decision of the Secretary was arbitrary and capricious, in this second case. The enclosed circular shows what I am doing. We have a strong bar."

On November 21, 1927, the attorney for the Receiver, Mr. Trask, wrote Mr. Dunn, in which he stated: "I have been informed by the receiver that you have made a tentative offer to take up the prosecution of this claim. The receiver, however, is unable to act upon your offer without first determining what Mr. Potts did in the matter of presenting and prosecuting the claim before he died."

On December 7, 1927, Dunn wrote Trask commenting upon the activities of Potts, and that such activities had come to an end by reason of the rulings of the Secretary of the Interior and the death of Potts, and then stated:

"I had lost sight of the fact that the Merritt Development Company had gone into receivership, and on the presumption that you may not have before you copies of the correspondence of recent date with Mr. Merritt I venture to send copies for the consideration of the receiver, and of your good self.

"You will be interested to know that the present status of the legislative and departmental action points to affirmative action in claimants' behalf. We are practically assured of the reopening of claims to enable (a) losses for so-called purchase of property items and interest paid on borrowed money to be paid and (b) losses arbitrarily disallowed such as the salvage in the instant case and the questions that Mr. Merritt discusses in his letters, etc., to be submitted to the Court of Claims (Federal). The latter to be enabled through a special Act that would cause test cases to determine the properness of the Secretary's decisions heretofore made in his discretionary jurisdiction. As you may know, the Supreme Court of the United States held that the Secretary had final authority to decide 'net losses.' ([Work v. United States ex rel. Chestatee Pyrites & Chemical Corp.] 267 U.S. 185 [45 S.Ct. 256, 69 L.Ed. 566]).

"Naturally, I would be glad to know that the Receiver will confirm the arrangement accepted by Mr. Merritt."

Then he closes his letter by stating: "Please do not hesitate to call on me for any information from the official files or for data as to the present activities of the legislative agents."

On December 15, 1927, Trask wrote Dunn:

"Your letter of December 7 was duly received. The fact that the matter of the receiver's employment of Mr. Potts to file a claim against the United States Government has been closed by the disallowance of the claim, as well as by Mr. Potts' death,

would seem to open the way for the receiver to accept your offer to act for him in presenting and prosecuting another claim against the Government upon the terms proposed.

"My understanding is that you offer to act as agent and attorney for the receiver in filing and prosecuting a claim or claims against the United States Government for a contingent fee of ten per cent of the amount, if anything, recovered upon the claim or claims, the receiver to pay no costs or disbursements, and to pay no fee or compensation for your services except the contingent fee of ten per cent of the amount or amounts, if any, recovered upon the claim or claims filed.

"Upon the receipt of a letter from you stating that these are the proposed terms, the receiver will apply to the Court for an order authorizing him to employ you upon these terms.

"It would be well, I think, in your letter to express a little more clearly what the claim or claims are which you propose to present and file. In your letter of October 8 to Mr. Merritt you state that 'The active interest for review of the claims will concentrate on two bills (a) from reimbursement of losses paid and obligated for interest on borrowed money, and (b) for losses on so-called purchase of property items.' "

Then, on December 29, 1927, Dunn wrote Trask:

" * * * At the outset permit me to say that the second paragraph of your letter of the 15th Dec., correctly sets out the detail of my offer to act as claims agent at Washington for the receiver in the above noted matter.

"Regarding your desire for a clear definition of the claim or claims which we propose to file, I regret that at the moment we are ourselves in something of an ambiguous position in this regard for the reason that Departmental and/or Legislative action is now pending; and it will be under the provisions of either or both that the claim will be filed."

It is to be gathered from other parts of this letter than Dunn and his associates were hoping to obtain from the Attorney General an affirmative opinion as to the Secretary's authority under the original Act of March 2, 1919, which would enable the claimants to again press their claims for additional awards under the Act. How-

ever, in the latter part of the letter, Dunn makes this statement: "If we can get before the Court of Claims I feel that we shall be able to present a meritorious case for the 'new shafts' expenditure and loss. We have a very strong set of agents working for the 'Court of Claims' Bill, including Bascomb Slemp; James Good, ex Chairman of the House appropriation committee and others representing large interests. But we are keeping the second proposed Bill in the background, pending favorable action on the items that the Secretary will not oppose, viz., Interest and Property."

On January 16, 1928, Trask wrote Dunn: "In further answer to your letter of December 29, permit me to say that we have submitted to the Court your offer to act for the receiver in this matter, upon the terms proposed as shown by our correspondence, and that the court has authorized and confirmed the receiver's acceptance of your offer, with the understanding that my name shall appear with yours as attorney for the receiver in the matter of this claim."

On January 23, 1928, Dunn wrote Trask:

"We understand that the Attorney General's opinion is being expedited. We have various interests working from different angles for War Minerals Relief. Our best interests are, I believe, in getting the interest and property matters authorized. The Court of Claims feature may wait. As a matter of fact we are assured that the Department will not agree to any relief or action other than the two items mentioned; and even then there may be a slip up.

" * * * I also send copy of S.1347; the Oddie bill. This has not yet been reported out of Committee. We hope to delay action on this pending the decision of the Attorney General."

There are no further letters that throw any particular light upon the activities of Dunn and his associates with reference to the furtherance of the War Minerals claim, though undoubtedly there was correspondence during the year 1928 between Dunn and Trask, but none of these letters have been introduced in evidence. It is to be assumed that a favorable ruling of the Attorney General was not forthcoming and that the activities of the group in Washington were centered on legislation.

On January 25, 1929, Dunn wrote Trask: "You will see from the enclosed circular letter (in the P. S.) that the committee has approved the Vinson bill. There was only

one vote against it. We are confident of passage at this session. I am confident that this proposed law will suit the Merritt Development Co. claim."

█ I. While Trask speaks of the Court's approval of Dunn's offer to act for the Receiver in this matter, no written approval was ever obtained from the court. The judge who had charge of the receivership during those years is no longer on the District Bench, and he was not called as a witness. Mr. Trask, while his recollection as to the circumstances is somewhat vague and indefinite, nevertheless is quite positive that an informal discussion was had with the court regarding the retaining of Dunn on a contingent fee. It is not suggested that the court was informed or knew that Dunn was to act as "legislative agent" as well as a representative of the Receiver in connection with the filing and prosecution of any claim in the Receiver's behalf. There is not much doubt in my mind that Trask discussed the employment of Dunn with the court, and that he at least informally received the court's approval. However, it is certain that the court was not informed of the prospective lobbying activities of Dunn which were unquestionably held out as an inducement to the Receiver and his attorney to accept the services of Dunn under the proffered contingent contract. Even though a written order of the court was not procured, it would seem that where one renders services at the behest of the Receiver which redound to the benefit of the estate and the party rendering the services assumed in good faith that a written order had been obtained, the court would recognize the propriety of allowing reasonable compensation to the person so employed. Consequently, if the failure to obtain a written order of the court was the only objection to Dunn's claim for services, it would be my view that at least a quantum meruit allowance should be approved. Undoubtedly, Dunn did perform substantial services in connection with the award made herein. Presumably, the Court could now make an order ratifying the engagement of Dunn. Freeman v. Hulbert, 230 Mich. 455, 203 N.W. 158.

II. Is the contract void because it is champertous? The objecting creditors point out that Dunn had no interest in the property or estate of the Merritt Development Company, or any interest in its claim against the Government. It is urged that he was an outsider who agreed to file and prosecute a claim against the Government for a contingent fee and that the recitals of the agreement in Trask's letter, which were approved by Dunn, require a finding that the estate should pay no costs or disbursements and that Dunn would handle the contemplated prosecution of the claim and pay all expenses out of his own pocket. Under these circumstances, it is urged that the contract is champertous under Merlaud v. National Metropolitan Bank, 65 App.D.C. 385, 84 F.2d 238; Peck v. Heurich, 167 U.S. 624, 17 S.Ct. 927, 42 L.Ed. 302; General Film Co. v. Sampliner, 6 Cir., 232 F. 95.

█ While there may be merit to the construction placed upon the language approved by Dunn with reference to paying costs and expenses, I conclude that a more reasonable interpretation requires the view that all that Dunn had in mind was the expenses that he himself might incur in connection with his duties as Washington agent for the Receiver, and that he did not convenant to underwrite all of the expenses, including attorneys' fees, in connection with the prosecution of the claim against the Government. Dunn was not an attorney and he recognized that Trask would have to handle the legal end of any matters before the courts, and furthermore, in one of the letters that Trask wrote Dunn, it was clearly indicated that the ten per cent which Dunn was to receive would be his compensation and that the services rendered by Trask to the Receiver in connection with the prosecution and litigation of any claim against the Government would be paid out of the estate as a cost of administration. That is the way the parties themselves construed their arrangement, and it is impelling evidence as to the practical and reasonable construction which should be given to the contract. A contingent fee arrangement whereby an agent merely agrees under the circumstances herein to pay his own expenses and does not agree to absorb all of the litigation costs in connection with the prosecution of a claim against the Government, is generally recognized as valid and not champertous.

III. The more important and controlling question arises as to whether Dunn's contract is void as being contrary to public policy. A consideration of this phase of the objections lodged by the creditors requires a somewhat detailed consideration of the salient facts and circumstances.

When Dunn wrote his circular letter in the Summer of 1927 to various War

315

Minerals claimants, including the president of Merritt Development Company and the Receiver herein, the right of the company as a claimant under the 1919 Act had been exhausted. Congressional enactment to clothe the courts with exclusive authority or with the right to correct the Secretary's ruling of law so as to permit recovery of certain types of losses denied by him, evidently was deemed necessary. A bill had been introduced in Congress providing for additional awards or relief, but apparently this bill failed of passage. Mr. Dunn stated in his circular letter that the bill failed "although the representations were pressed with activity and ability by small bands of agents and claimants." Further, it will be observed that this circular letter contemplates two types of services on the part of Dunn; one, to aid in procuring the necessary legislation, and the other to handle the claims filed in pursuance thereto. When Dunn states that he had been "asked to assist in this work," there can be no doubt that he referred to the activity in favor of a bill through Congress in behalf of the claimants who needed additional legislation to enable them to press for additional awards. Furthermore, it seems indisputable from the correspondence that Dunn had associated himself with attorneys, agents and others who were engaged in concerted activity in behalf of such legislation. Some of such work undoubtedly was centered on representatives of the Department of the Interior so as to obtain favorable reaction from them when and if any hearing was had before a Congressional Committee. Other lobbying work was directed at Congressional members. It would appear that Dunn was an important member of these so-called groups. He asked the various claimants to whom his circular letter was sent to "favor me with your views and figures as they affect your claim that I may be the more fully armed for discussions with Senators and Congressmen."

There was before this Court, at the hearing on Dunn's claim, the files and records in another receivership,—the Cuyuna Minneapolis Iron Company. Mr. Crowley was also Receiver of that company, and it appears that, as such Receiver, he also entered into a contract with Dunn for his services in connection with the claim that that company had before the War Minerals Relief Committee. In the report that the Receiver made to the court in that receivership, there is contained a copy of a letter written by Dunn, the authenticity of which Dunn has not denied. It refers to a circular letter of solicitation written by Dunn in 1927 to the Cuyuna Company. It is to be assumed that the Potts referred to therein is the same Potts referred to in Trask's letter to Dunn of November 21, 1927. The following excerpt from that letter is revealing:

"The late Charles Potts of Deerwood did the legislative work for the Minnesota people in the past. * * * I am busying myself now in this regard and am identifying myself with the Minn.-Ill. and Wisc. interest. We have a strong lobby from Georgia, Colorado, California and Arkansas, and feel that we have a fifty-fifty chance of securing the necessary amendatory legislation during the next session of Congress.

"May I not say that I would be glad to know that you are contributing. I propose to charge 10% on any recovery for which I would do the necessary pre-legislative work here (the new members of both houses have to be educated to our point of view and side) and assist the attorney in the preparation and presentation of the claim."

The Vinson Bill was passed in February, 1929, and this amendment of the War Minerals Relief Act afforded claimants who had filed their claims under the 1919 Act the right to obtain a review of any errors of law which were made by the Secretary of the Interior in passing upon such claims. Mr. Trask handled the legal proceedings in Washington and was advised and assisted by Mr. Dunn in handling the prosecution of the claim under the 1929 Act. As a result of the litigation and the adjustment thereafter made, the sum of $25,-355.89 came into this receivership estate and Dunn contends that he is entitled to ten per cent of the amount so recovered.

We must commence with the premise that there was no lawful existing claim in this estate against the Government in 1927 when Dunn solicited and procured his contingent contract with the attorney for the Receiver. That is, the Government was under no legal obligation to make amends for any losses sustained by mine owners or operators by reason of the so-called stimulation engendered by government agencies at the time of the World War of 1917-18. The 1919 legislation had for its purpose the

adjustment and payment of net losses suffered by those who produced, or were prepared to produce, various types of ore in compliance with the request or demands of certain government agencies. Undoubtedly, the use of these metals was essential in carrying on the war. The stimulation so-called arose when the Government requested, and in some instances demanded, that the mine owners and operators increase the output of their mines or extend their operations so that more ore could be produced. But withal, no legal obligation arose against the Government by reason of this stimulation. Such stimulation was merely incidental to the needs of the Nation in waging a World War, and finds its counterpart in many other activities during this period. Farmers were urged to extend their acreage so that more food could be raised, and manufacturers were requested to extend their operations and in some instances to revolutionize their business so that they could take on war contracts. Necessarily, in carrying on a World War, the entire Nation must be mobilized. Inevitably, when the war ends, some citizens will sustain losses by such stimulation and the over-expansion of their business which will find no outlet in a peace world. It follows, therefore, that any relief granted under these circumstances by the Government was a mere gratuity, and no claimant had any vested rights therein. See, Work v. United States ex rel. Rives, 267 U.S. 175, 45 S.Ct. 252, 69 L.Ed. 561. The view indicated herein finds unquestioned support in the language used by Judge Taft when he was construing the 1919 War Minerals Relief Act in the case just cited. He refers to Section 5 of the Act and makes this statement (267 U.S. at page 181, 45 S.Ct. at page 254): "The above summary of section 5 clearly shows that Congress was seeking to save the beneficiaries from losses which it would have been under no legal obligation to make good if a private person. It was a gratuity based on equitable and moral considerations. * * * Congress did not wish to create a legal claim. It was not dealing with vested rights."

In Ickes v. Cuyuna Mining & Investment Co., supra, in determining whether a claim under the 1929 Act was assignable, the court made reference to Judge Taft's construction of the 1919 Act, stating (page 664 of 69 F.2d): "This decision [Work v. United States ex rel. Rives] was rendered prior to the passage of the 1929 act, but there is nothing in that act which in any way changes the character of the claims. The claims still remain purely in the nature of a gratuity by the government, and are not legal claims against the government, nor does the act create in the claimants any vested legal rights. The 1929 act limits the right of action to a claimant whose claims had been adjusted under the prior acts by the Secretary of the Interior."

A consideration of the correspondence herein impels the view that the contingent contract entered into between Dunn and Trask had for one of its purposes and objects the procurement of favor legislation. In other words, Dunn agreed to lobby for the procurement of a new bill which would enable the Receiver to again assert his claim against the Government, which claim was not based on a legal debt. Just what lobbying he did do is quite immaterial. The representations and assurances to those from whom he sought contingent contracts for his proposed services unmistakably indicate what he proposed to do for the ten per cent remuneration which he was to receive. Indeed, there is no showing that he did not do that which he stated he would and could do. Dunn does not deny lobbying in behalf of legislation for War Minerals claimants. It appears that he acted in behalf of several other claimants besides the Receiver herein. Large and substantial claims were represented by him. Undoubtedly, he was vitally concerned with the procurement of additional legislation. There is no suggestion that any of his work or that of his associates in lobbying for the legislation was improper, but the validity of the contract is dependent upon whether it contemplates the performance of services which, under the circumstances herein, the law frowns upon. If it is against public policy for an agent to solicit claims against the Government and to agree to aid in the procurement of "favor legislation" so that such claims may provide a basis for an award from the Government and a contingent fee based upon said award to the agent, then the contingent contract herein is void and unenforcible. A long line of decisions in the Supreme Court of the United States and other courts leave no doubt as to the applicable principles of law.

In Trist v. Child, 88 U.S. 441, 21 Wall. 441, 22 L.Ed. 623, it appears that one Trist had a claim for services against the Govern-

ment growing out of the treaty of Guadelupe Hidalgo, which claim, however, had not been recognized by the United States. He made an agreement with one Child to take charge of the claim and present it before Congress as his agent and attorney. As compensation, Child was to receive twenty-five per cent of whatever Congress allowed in payment of the claim. Child and his son, the latter having succeeded to the contract, prepared a petition and presented the claim to Congress. Thereafter, the Childs interviewed various members of Congress and engaged in general activity in obtaining support for the bill. By an Act of Congress, a sum was appropriated in payment of the Trist claim. Trist refused payment of the twenty-five per cent stipulated for in the agreement, however, and this action ensued. In holding the contract void and unenforcible, the Supreme Court did so because of the inherent temptation to corrupt and unduly influence legislators, declaring (88 U.S. at page 451, 21 Wall. at page 451): " * * * To legalize the traffic of such service, would open a door at which fraud and falsehood would not fail to enter and make themselves felt at every accessible point. It would invite their presence and offer them a premium. If the tempted agent be corrupt himself, and disposed to corrupt others, the transition requires but a single step. He has the means in his hands, with every facility and a strong incentive to use them. The widespread suspicion which prevails, and charges openly made and hardly denied, lead to the conclusion that such events are not of rare occurrence. Where the avarice of the agent is inflamed by the hope of a reward contingent upon success, and to be graduated by a percentage upon the amount appropriated, the danger of tampering in its worst form is greatly increased."

In Hazelton v. Sheckells, 202 U.S. 71, 26 S.Ct. 567, 50 L.Ed. 939, 6 Ann.Cas. 217, there was a contract to deliver certain real property at an agreed price within the duration of a specific session of Congress, it being understood that, as a part of the consideration, the party to whom conveyance would be made would endeavor to procure legislation so that the property could be sold to the United States. It appears that Hazelton was under no obligation to take and pay for the property, but, in accordance with the contract, he did work for the bill before Congress in various ways, and thereafter a bill for the purchase or con-

demnation of the property involved was enacted during the session named in the contract. Hazelton sought specific performance. Justice Holmes, in declaring the contract void and unenforcible, stated 202 U.S. at page 78, 26 S.Ct. at page 567; " * * * But the services contemplated as a partial consideration of the promise to convey were services in procuring legislation upon a matter of public interest, in respect of which neither of the parties had any claim against the United States. An agreement upon such a consideration was held bad in Providence Tool Co. v. Norris, 2 Wall. 45, 17 L.Ed. 868."

This question was considered in Gesellschaft v. Brown, 64 App.D.C. 357, 78 F.2d 410 (second appeal, Brown v. Gesellschaft, 70 App.D.C. 94, 104 F.2d 227), certiorari denied 296 U.S. 618, 56 S.Ct. 139, 80 L.Ed. 439. There, the court considered the validity of a contingent fee contract entered into with a foreign corporation by a former attorney employed by the Alien Property Custodian to take steps looking to the enforcement of the right of the foreign corporation against the Custodian and the United States Government with respect to certain property seized during the World War. There was no valid existing claim against the Government. The court construed the contract as being sufficiently comprehensive to encompass the services of the attorney in procuring remedial legislation, and found that plaintiff and his associates did use their influence with members of Congress for such purposes. The contract was held void. There, the contract was procured by a former attorney of the Government agency involved. Here, we have a former chief examiner of the War Minerals Relief Commission. I do not understand, however, that the fact of former employment or its character is necessarily controlling. The vice is the same. It may be pointed out, however, that this claim which Dunn was to handle for the Receiver was the very same claim he had handled for the Commission while in its employ. In taking cognizance of the rule that an attorney who had acted for a client could not assume a position hostile to the client concerning the same matter, the court stated, 78 F.2d at page 412: "The propriety of this rule has long been recognized and enforced. It is the enunciation of a principle of the common law that courts will not lend their aid to enforce illegal contracts or contracts inconsistent with sound morals

or public policy. This has led to a general condemnation of contracts for the procuring of legislation especially where the legislation is remedial and provides for the assertion of claims against the government, and the contract is for a contingent portion of a claim that may be given legal status through success in securing the legislation. Such contracts are illegal as tending to corrupt by improper influence the integrity of our political institutions. It is incumbent, therefore, upon the courts to pronounce void any such contract in which the ultimate or probable tendency would be to corrupt or mislead the judgments of legislators in the performance of their duties." Further, 78 F.2d at page 413:

"* * * In determining the question of public policy, we are not so much concerned with what was done by the plaintiff, as by what the terms of the contract afforded him and his associates an opportunity of doing. The contract in broad terms authorized plaintiff and his associates to take such steps as they might deem necessary for protecting the rights of the defendant against the Alien Property Custodian, the United States government, or any of its departments, or their agents or representatives, and to enforce their rights against any department, bureau, or division of the government.

"To determine the inducement afforded the plaintiff and his associates for improper or corrupt conduct, the terms of the contract are controlling, and in determining the validity of their claim for compensation the court must be guided by what they contracted to do rather than the service rendered. * * * We assume that they [the services] were legitimate, but the validity of the contract depends on the nature of the original offer, and, whatever their form, the tendency of such offers is the same. * * * The court will not inquire what was done. If that should be improper, it probably would be hidden, and would not appear. In its inception, the offer, however intended, necessarily invited and tended to induce improper solicitations, and it intensified the inducement by the contingency of the reward."

See, also, Noonan v. Gilbert, 63 App.D. C. 30, 68 F.2d 775.

Claimant herein largely relies on Hollister v. Ulvi, 199 Minn. 269, 271 N.W. 493, but it is significant that the court therein expressly differentiated the situation from that which existed in Gesellschaft v. Brown, supra. The Minnesota court considered that the losses sustained by reason of the negligent operation of the railroad while in the hands of the Director General gave rise to a debt and a legal claim against the Government. The legal liability of the railroad administration had been theretofore established by the courts of Minnesota. Consequently, any activities in favor of the legislation involved in Hollister v. Ulvi, was the procurement of "debt legislation" and not "favor legislation." Here, we have no legal liability on the part of the Government. Rather, the Government merely bestowed a gratuity, as Chief Justice Taft said, out of "equitable and moral considerations." A reading of Hollister v. Ulvi will indicate that the court recognized the difference between "favor legislation" and "debt legislation" and specifically held that the contract that was there under consideration pertained to "debt legislation" and the complaint was not vulnerable upon a demurrer.

It is asserted by Dunn that the letters which passed between him and Trask merely referred to the retaining of Dunn to file and prosecute the claim against the Government, and that there is an absence of any agreement on his part in such letters to do any lobbying for legislation. However, in trying to avoid the patent invalidity of his contract, the claimant loses sight of the uncontradicted facts and circumstances. No claim could be filed or prosecuted until legislation was enacted. The assumption that the Attorney General would advise the Secretary of the Interior that the claimants under the 1919 Act had certain rights which the Secretary had refused to recognize, did not materialize. At all times, Dunn was engaged with others in obtaining the proposed legislation. He had two strings to his bow; one was departmental relief, and if that failed, the necessary legislation would be obtained. The inducements and representations set forth in the circular letters and the correspondence leading up to the arrangements made between Dunn and Trask unmistakably indicate that the efforts in behalf of legislation were an integral part of the contract for services to be rendered. Otherwise, why the representations on his part as to the effective lobbying connections which he asserted, and which he assured those whom he solicited would produce the necessary results in providing legislation so that

claims could be again prosecuted. The agreement on his part to influence the necessary legislation was explicit in the agreement which was accepted by the president of the Merritt Development Company, and was necessarily implicit in the subsequent agreement which he purported to make with the attorney for the Receiver. In effect, all that Trask did was to approve the arrangements which Dunn had purported to make with Merritt. That is what Dunn asked him to do.

Nothing contained herein should be construed as any intimation that Dunn used improper influence on legislators or others. It may be assumed that his contacts with Congressmen and others adhered to every propriety. Nor is there any suggestion that Dunn procured confidential information when he was employed by the Commission. It would appear that everything in the files of the Commission was open to the public. However, that Dunn in the solicitation of these contracts emphasized his former connections with the Commission and his knowledge of the entire situation, is not contradicted. The former relationship and his agreed efforts to procure the required legislation were the main factors in the contract. Dunn contends that the Commission informed him that it was proper for him to handle such claims in that he had been absent from the Commission for over two years. There is no reason to doubt that such assurance was given to him by the Commission.

■ That such an agreement and arrangement as disclosed herein may have a tendency to corrupt or unduly influence legislators to enact "favor legislation" is unfortunately not rare. In this case, there was a concerted effort of agents and attorneys, including Dunn, who banded together to procure such remedial legislation. Without the procurement of such legislation, his services would be rendered for naught. The very statement of the situation reflects the evils that might arise from such an arrangement. It is the tendency of such a contract to induce improper solicitations of a legislative body which is contrary to public policy. The ruling adhered to herein may seem harsh and unnecessarily unyielding, but it may be pointed out that, until this claim was filed herein some fifteen years after the contract was made, these objecting creditors had no knowledge or notice of any such claimed contract or arrangement between Trask and Dunn. Extended litigation in the courts of the District of Columbia has delayed the granting of any award on the claim that was filed. Where contracts contravene public policy, they cannot be sustained even though the beneficiaries may reap the benefits thereof. The Court has no alternative.

It must follow, therefore, that the claim filed herein is void and cannot be sustained as a basis for any recovery according to the terms thereof, or even on a quantum meruit basis. In Gesellschaft v. Brown, supra, the court disposed of the claim of quantum meruit as follows (page 415 of 78 F.2d): "Nor are we impressed with the suggestion that inasmuch as defendant availed itself of the right under the contract to terminate this employment and to pay 'a fair and reasonable fee' for the services rendered to the date of termination, that the action here may be upheld, since it is in the nature of a suit in quantum meruit to recover reasonable and fair compensation for the services rendered. The difficulty with this contention is that the determination of the compensation, if any, defendant is entitled to, depends upon the services rendered, and this at once leads to the terms and conditions of the contract which, if void, prohibits the recovery of any compensation under it."

The entire contract became contaminated with that which was bad, and therefore all its parts are affected and unenforcible. It is malum in se. It follows from the findings above stated that the claim of William H. Dunn filed herein be, and the same hereby is, in all things denied and disallowed. It is so ordered.

An exception is allowed.