UNITED STATES v. BAY AREA PAINTERS AND DECORATORS JOINT COMMITTEE, Inc., et al.

No. 27899-S.

District Court, N. D. California, S. D.
April 19, 1943.

734

Tom C. Clark, Asst. Atty. Gen., Frank J. Hennessy, U. S. Atty., of San Francisco, Cal., Pierce W. Bradley, Sp. Asst. to Atty. Gen., and Joseph L. Alioto, George W. Hippeli, and Lawrence W. Somerville, Sp. Attys., all of San Francisco, Cal., for plaintiff.

Harold C. Faulkner, Gregory, Hunt, Melvin & Faulkner, Joseph C. Sharp, and Derby, Sharp, Quinby & Tweedt, all of San Francisco, Cal., Joseph A. Padway, of Washington, D. C., I. B. Padway, Mathew O. Tobriner, P. H. McCarthy, Jr., Clarence E. Todd, and Raoul Magana, all of San Francisco, Cal., and Arch MacDonald, of Oakland, Cal., for various defendants.

ST.SURE, District Judge.

An indictment was found against 78 persons, charging them with conspiracy to prevent the use of spray painting equipment, paint, and painting materials in painting business, in restraint of interstate commerce, in violation of the Sherman Anti-

Trust Act, Act of July 2, 1890, 26 Stat. 209, as amended, 15 U.S.C.A. § 1. Defendants have interposed demurrers on the general ground that the indictment fails to allege facts sufficient to constitute a public offense.

Defendants are The Bay Area Painters and Decorators Joint Committee, Inc. (composed of representatives of various painters' unions and contractors' associations), Building and Construction Trades Councils of various counties within the Northern District, fourteen local unions of the Brotherhood of Painters, Decorators and Paperhangers of America and certain contractors' associations, in this District, and The Painting and Decorating Contractors of America, a national association of painting and decorating contractors. Various officers of these unions and employer associations have been indicted as individual defendants.

The indictment alleges that the "conspiracy has consisted of a continuing agreement and concert of action among the defendants, the substantial terms of which have been that:

"(a) Defendant employers and defendant unions have agreed to restrict the use of painting by spray equipment by written and oral agreements which have been renewed from year to year within the period of this indictment pursuant to and in furtherance of said conspiracy." The rest of the charges relate to the manner of enforcement of the agreement by refusal to furnish labor, the levying of fines, etc.

The indictment further alleges, concerning the effect of the conspiracy, as follows:

"32. The things done and the acts performed pursuant to and in furtherance of the combination and conspiracy herein alleged and described have had the necessary direct effect of substantially affecting and restraining and diminishing interstate commerce in spray equipment, paints, and painting materials.

"33. The things done and the acts performed pursuant to and in furtherance of the combination and conspiracy herein alleged and described were intended by defendants to affect and restrain and diminish interstate commerce in spray equipment, paints, and painting materials."

It is obvious that these allegations are mere legal conclusions. There is no allegation of an actual or direct prevention of the manufacture or sale of the spray equipment, or of its shipment into the state.

There is no allegation in the indictment that defendants intended to fix prices or suppress competition. It was said in Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 996, 84 L.Ed. 1311, 128 A.L.R. 1044, that "Restraints on competition or on the course of trade in the merchandising of articles moving in interstate commerce" do not violate the Sherman Law "unless the restraint is shown to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition. * * * The restraint here * * * has not been shown to have any actual or intended effect on price or price competition." In Appalachian Coals v. United States, 288 U.S. 344, 360, 53 S.Ct. 471, 474, 77 L.Ed. 825, the court quotes with approval the following language: "Only such contracts and combinations are within the act as, by reason of intent or the inherent nature of the contemplated acts, prejudice the public interests by unduly restricting competition or unduly obstructing the course of trade."

The Government cites the case of United States v. Lumber Products Ass'n et al., D.C., 42 F.Supp. 910, tried in this court in 1941, pending on appeal, as supporting its contention that the indictment is sufficient. In that case the non-union defendants were California manufacturers and dealers in lumber and millwork, and the allegations in the indictment relative to the exclusion of lumber and millwork from other states than California were certain and definite; it was specifically alleged that the conspiracy prevented the sale and delivery of millwork actually shipped in interstate commerce from states other than California to San Francisco. It was the very purpose of the combination and conspiracy to eliminate competition in lumber and millwork from other states. Here it appears that defendant contractors are not in the paint spray equipment business and are not in competition with the trade which it is alleged they restrained.

The indictment here is based upon the fact that defendants agreed to restrict the use of paint spray equipment by themselves, and to enforce such restricted use among themselves. In Industrial Association v. United States, 268 U.S. 64, 80, 45 S.Ct. 403, 407, 69 L.Ed. 849, a number of building contractors combined to maintain an "open shop" by requiring permits to be secured by contractors for the purchase of certain

building materials, most of which were manufactured in California. The District Court stressed the point that plumbers' supplies, most of which were manufactured out of state, and for which permits were not required, would be prevented from entering the state because contractors not having permits would be unable to build and hence would have no use for plumbing supplies. The Supreme Court said: "But this ignores the all-important fact that there was no interference with the freedom of the outside manufacturer to sell and ship or of the local contractor to buy. *The process went no further than to take away the latter's opportunity to use, and, therefore, his incentive to purchase.* The effect upon, and interference with, interstate trade, if any, were clearly *incidental, indirect and remote * * *.*" (Emphasis supplied).

In Levering & G. Co. v. Morrin, 289 U.S. 103, 53 S.Ct. 549, 551, 77 L.Ed. 1062, it was held that a conspiracy by labor unions to halt or suppress local building operations to compel the employment of union labor was not illegal under the Sherman Act. The Supreme Court did not base its decision on the fact that this was a labor contract but on the conclusion that the *use* of the materials was a purely local matter, and the suppression of their use the result of a local aim, and said: "If thereby the shipment of steel in interstate commerce was curtailed, that result was incidental, indirect and remote, and, therefore, not within the antitrust acts, as this court, prior to the filing of the present bill, had already held."

In the present case, the effect of the agreement to limit the use of paint spray equipment in fulfilling local painting contracts would probably be to reduce the sales of such equipment and thus reduce the amount of such equipment shipped into California. But under the above-mentioned cases such an effect is indirect and remote unless it is the clear intent and purpose of the agreement to bring about such a direct result. No facts appear in the indictment from which a conclusion can be reached that such was the intent of the parties.

At the hearing on the demurrers defendants handed to the court without objection by the Government a pamphlet entitled "Working Conditions and Agreement for Painters." The agreement was discussed at the hearing and appears to be the agreement complained of in the indictment as constituting a restraint on interstate commerce. The "Preamble" states that the agreement is between the members of certain of the employer associations and unions named as defendants in the indictment. The consideration and purpose of the agreement are stated as follows: "That for and in consideration of harmonious relations between the parties above referred to and the public of the Bay Area, and the maintenance of stability of the conditions of employment and other mutually beneficial relations and for the purpose of preventing strikes and lockouts by facilitating just and peaceful adjustment of disputes and grievances that may arise from time to time, and for the purpose of protecting and safeguarding the health and safety of the parties concerned, the parties hereto have agreed that the understanding hereinafter set forth shall be binding on all members of the parties thereto individually and collectively."

The agreement provides for hours of work, wages and the manner of their payment, holidays, apprentice workers, handicapped workers, shop cards, identification cards, etc., carrying of equipment, posting specifications, shop and job stewards, types of brushes and tools, penalties for violation of the agreement, and other provisions relating to working conditions.

Section 10 of the agreement contains the only provisions relating to spray regulations. It recites in part:

"1. The Councils and/or Local Unions are opposed to the use of the spray machine in the Painting and Decorating Industry and their rules and laws require that 'no member of the organization shall accept employment requiring the use of the spray machine.' Due to the opposition of the Councils and/or Local Unions a complete elimination of the spray machine was imminent and only after days of conference during which an examination and analysis of conditions were made, did the Associations and/or Chapters prevail upon the Councils and/or Local Unions to agree to spraying to a limited extent as hereinafter set forth.

"2. It is recognized that unless regulated the use of the spray equipment is injurious to the health of the men concerned. However, it is agreed that in the instances herein specifically mentioned (which the parties agree are less hazardous although still involving danger to the men) the use of the spray equipment shall be permitted, provided that every reasonable device and method be adopted to minimize the danger

and hazard to the men involved and that all appropriate regulations of state and municipal departments, commissions and health officers are observed including the rules and regulations of the Industrial Accident Commission."

There follows a list of areas in which the use of spray equipment is permitted. Provision is made for exceptional conditions not covered by the regulations.

The agreement appears on its face to be in settlement of "a dispute concerning terms or conditions of employment." 29 U. S.C.A. § 52. Apparently no advantage accrues to the employers from the agreement except that of maintaining peaceful relations with their employees.

The unions had two legitimate purposes in demanding the restriction of the use of paint spray equipment: the use of the spray equipment constitutes a health hazard; and such equipment saves time and thereby cuts down the amount of employment. In United States v. American Federation of Musicians, D.C., N.D.E.D. Ill., 47 F.Supp. 304, decided October 14, 1942, affirmed by the Supreme Court without opinion February 15, 1943, 63 S.Ct. 665, 87 L. Ed. ——, it was held that labor might combine to seek and obtain more employment through the elimination of the competition of mechanical devices; that such was a "condition of employment" and that their activities were within the exemptions of the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq.

In the Carrozzo case, United States v. Carrozzo, D.C., 37 F.Supp. 191, 196, affirmed United States v. International Hod Carriers, etc., 313 U.S. 539, 61 S.Ct. 839, 85 L.Ed. 1508, the indictment charged an unlawful conspiracy to restrict the use of concrete truck mixers in the Chicago area. Demurrers were sustained to the indictment, the court saying: "Such normal, legitimate and lawful activities of a labor union include the calling of strikes, or threatening to call strikes, in order to enforce their demands, as in the present case a demand against the use of labor saving devices which will displace their members; or, in the alternative, the demand that if the labor saving device is used the same number of men be employed as would be if the other type of mixer were used. These are legitimate and lawful activities which a labor union is permitted to carry on in an effort to maintain employment and certain working conditions for

its members, *and any restraint of trade or commerce attendant thereon is only indirect and incidental.* \* \* \*"

 The court will take judicial notice of the fact that the use of spray painting equipment constitutes a health hazard. It would appear that this would afford a good and sufficient reason for the unions to demand restriction or even prevention of the use of such equipment, and that the restraint would be immunized by § 20 of the Clayton Act and by the Norris-LaGuardia Act.

The indictment was framed upon the theory that the combination and conspiracy complained of was between trade unions and non-labor groups, and that what was done constituted a violation of the laws of the United States. Within recent years the Supreme Court has had much to say upon the question of the applicability of the Sherman Law to trade unions when considered with related enactments. As was said in United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 466, 85 L.Ed. 788, "whether trade union conduct constitutes a violation of the Sherman Law is to be determined only by reading the Sherman Law and § 20 of the Clayton Act [29 U.S. C.A. § 52] and the Norris-LaGuardia Act [29 U.S.C.A. § 104] as a harmonizing text of outlawry of labor conduct."

The Government contends that the Clayton and Norris-LaGuardia Acts furnish an immunity only "so long as the union acts in its self-interest and does not combine with non-labor groups." This question was discussed in the Musicians' case, supra. To the contention of the Government that even though it be assumed that the activities of the defendant in that case concerned "terms and conditions of employment", the union was attempting to force employers to combine with it to restrain interstate trade, a combination between labor and non-labor groups which the Government claimed was not exempt from the Sherman Act, the court said: "The third contention of the Government deserves only a word. Here the employees seek only a contract with their employers for a 'closed shop' (in a sense large enough to include a shop which excludes not only non-union workers but also machines) and they seek this contract primarily for their (the servants') benefit and not for the benefit of a non-labor group. In the court's opinion United States v. Brims, 272 U.S. 549, 47 S.Ct. 169, 71 L.Ed. 403, and like

cases, are not pertinent here." [47 F.Supp. 309.]

Part of the stated policy of the Norris-LaGuardia Act is to enable the worker to appoint representatives to negotiate the terms and conditions of his employment, and to free him from certain restraints on activities for the purpose of collective bargaining. So long as these activities fall within the provisions of the Clayton and Norris-LaGuardia Acts, the unions are exempt from prosecution under the Sherman Law.

The unions must necessarily "negotiate" and "bargain collectively" with the employers. It would seem beyond belief that Congress intended to protect the machinery used by labor to enable it to negotiate and bargain collectively for terms and conditions of employment and then, after it completes its negotiations and has made its bargain through agreement with the employers, to withdraw that protection and leave the parties to the agreement liable for prosecution for criminal conspiracy. Such a construction would vitiate the effect of the Clayton and Norris-LaGuardia Acts, for such agreements almost always have some effect on interstate commerce, if only to raise prices by increase in wages or decrease in hours of work.

In United States v. Hutcheson, supra, the Supreme Court said: "If the facts laid in the indictment come within the conduct enumerated in § 20 of the Clayton Act they do not constitute a crime within the general terms of the Sherman Law because of the explicit command of that section that such conduct shall not be 'considered or held to be violations of any law of the United States.' So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means."

From this language it is reasonable to infer that where a union *does* combine with non-labor groups the end to which its activities have been the means should be considered. It is easy to see the widespread evils that could result if employers were permitted to join with the unions in all the activities exempted by the Clayton and Norris-LaGuardia Acts. Industry within the state could by direct means virtually eliminate competition with other states. But where the demands of the union for certain "terms and conditions of employment", considered apart from their activities in obtaining them, appear reasonable, an acceptance thereof by the employers should not render them unreasonable and unlawful, even though indirectly a restraint on interstate commerce may result, so long as such restraint is not the direct intent of the agreement.

I am of the opinion that the restraint complained of in the indictment is reasonable, and that its effect on interstate commerce is indirect, incidental and remote, and that the agreements alleged to constitute a combination in restraint of trade provide for terms and conditions of employment within the contemplation of the Clayton and Norris-LaGuardia Acts.

The demurrers will be sustained and the indictment dismissed as to all defendants.